| | |
|---|---|
| WALMART INC., WAL-MART STORES EAST, LP, WAL-MART LOUISIANA, LLC, WAL-MART STORES, TEXAS, LLC, WAL-MART STORES ARKANSAS, LLC, WAL-MART PUERTO RICO, INC., WAL-MART.COM USA, LLC, WALMART APOLLO, LLC, <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. <br><br> CAPITAL ONE, NATIONAL ASSOCIATION, <br><br> Defendant and Counterclaim Plaintiff. | Case No. 23-cv-2942 |

## ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS

Defendant and Counterclaim Plaintiff, Capital One, National Association ("Capital One"), by and through its undersigned attorneys, files this Answer to the First Amended Complaint and Counterclaims against Plaintiffs and Counterclaim Defendants Walmart Inc., Wal-Mart Stores East, LP, Wal-Mart Louisiana, LLC, Wal-Mart Stores, Texas, LLC, Wal-Mart Stores Arkansas, LLC, Wal-Mart Puerto Rico, Inc., Wal-Mart.com USA, LLC, Walmart Apollo, LLC (together, "Walmart"), and alleges as follows:

# I.    INTRODUCTION

1.    This case is about Walmart's attempt to extricate itself from a ████████ ████████ partnership agreement (the "Agreement") ████████ early because Walmart no longer likes the economic terms of the partnership to which it agreed.

2.    Despite having actively pursued Capital One as a partner just a few years ago, Walmart has now informed Capital One that its priorities have changed, straining to abandon its partnership with Capital One and move the credit card business to a fintech joint venture in which Walmart recently acquired a controlling interest.  To do so, Walmart has deliberately misinterpreted the Agreement by claiming that it has the right to terminate the contract early on the basis of pretextual servicing issues that had no meaningful impact on cardholders, Walmart, or the card partnership.

3.    This suit is the culmination of Walmart's years of bemoaning the financial terms of the deal it struck and of repeated failures to live up to its contractual obligations in favor of ventures it believed more profitable to Walmart.

4.    The plain language of the Agreement forecloses any effort by Walmart to terminate the partnership early.  The Agreement is explicit that a termination right is triggered only if Capital One fails to meet a customer service benchmark known as "a Critical SLA, five or more times" in a twelve-month period.  As Walmart does not dispute, no Critical SLA miss has repeated five times.  Instead, Walmart seeks to twist the contractual provision to mean that a termination right is triggered if *any* five Critical SLAs are missed in a twelve-month period.

5.     Walmart's interpretation of the termination provision is also contrary to the broader context of the Agreement, which imposes carefully structured obligations when an SLA miss occurs, and then an escalating series of consequences if it recurs. These provisions require Capital One first to report a failure, then to submit a plan to address it, and then to execute the plan to remediate the failure. Recurrences of particular failures result in financial penalties. Termination of the parties' ███████ partnership was intended as a last resort, triggered only if the foregoing efforts have proved so unsuccessful that a particular failure occurs five times in a 12-month span.

6.     Walmart's erroneous reading of the Agreement would negate that careful design. It would give rise to a termination right that could be triggered without affording to Capital One any opportunity to remediate a Critical SLA miss and without imposing any intermediate financial penalties for a recurrence of that servicing issue. That interpretation cannot be squared with the language or structure of the Agreement.

7.     ███████████████████████████████████████████████████

8.     Capital One brings these counterclaims to oppose Walmart's wrongful attempt to terminate the parties' Agreement and to hold Walmart accountable for its years-long failure to live up to its contractual marketing obligations.

9.     Until Walmart manufactured a termination right and commenced this litigation, Capital One tried to resolve the disputes underlying these counterclaims by working with Walmart as the long-term business partners Capital One believed they were.

10.	The parties' partnership began in July 2018, when the parties entered into the Agreement for Capital One to become the exclusive issuer of Walmart-branded credit cards ██████ referred to as the "Card Program."

11.	As Walmart represented to Capital One in the parties' initial discussions, combining Capital One's extensive track record of successful credit card partnerships and industry-leading technology with Walmart's unparalleled customer reach—through its then 5,400 store locations nationwide and 140 million in-store customers each week—would create a Card Program with enormous growth potential.

12.	On this basis, and consistent with card partnership industry practice, Capital One and Walmart agreed to contractual terms that bound them together as partners in order to protect the significant investments both parties would be required to make to build and maintain a ██████ partnership.

13.	Among other things, ████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████.

14.	Believing it was laying the foundation for at least a ██████ partnership, Capital One invested ████████████████████████████████████—building the Card Program in the 14 months leading up to its fall 2019 launch.

15.	And in the years since the 2019 launch, Capital One has continued to invest ██████ ████████████████████████████ to ensuring the Card Program's success, consistently and in good faith delivering on its contractual obligations to build and sustain a successful card partnership.

16. Walmart, in contrast, has utterly failed to live up to its contractual commitments because it is unhappy with the economic terms of the bargain it struck.

17. Walmart's dissatisfaction became apparent to Capital One just months after the Card Program's launch and only increased as the Card Program progressed. The portfolio of Walmart credit card accounts issued by Synchrony had high credit losses, ███████ ███████████████████████████████████████ Walmart was also unhappy with the economic impact of increased online sales under the Card Program, ███████████ ██████████████████████████████████████████

18. Walmart executives have repeatedly confirmed this dissatisfaction to Capital One. For example, Walmart executives informed Capital One that the Walmart team which negotiated the Agreement "didn't understand" credit cards, and negotiated a "bad deal" for Walmart. Indeed, several of the key executives on Walmart's 2018 negotiating team were separated from Walmart in the years following the negotiations. The new executives in charge of the Card Program did not share the prior executives' vision for the card partnership.

19. Rather than work through performance issues as partners and try to grow the Card Program in the manner contemplated by the Agreement, Walmart did the opposite, deciding to starve the Card Program of the promotion resources expressly and implicitly required by the Agreement.

20. In doing so, Walmart willfully refused to live up to its contractually-required marketing obligations. Specifically, it has failed since at least early 2021 to live up to its obligation to ███████████████████████████ promote the Card Program through all of Walmart's ███████████████████████████████████████

21.  In particular, Walmart has breached its contractual commitment to ensure the Card Program is promoted in thousands of Walmart stores nationwide. Despite providing projections during negotiations based on the strong in-store card sales experienced during the Synchrony program, Walmart unilaterally ended the incentive program for in-store associates that was in place during the Synchrony relationship before the Card Program's Fall 2019 launch. Walmart refused to offer any alternative method of encouraging in-store card applications.

22.  Walmart has also all but erased the Card Program from the Walmart.com homepage, refusing to give it the ███████ online placement the Agreement expressly requires and that the Card Program received immediately after the launch. Other Walmart products—such as Walmart Plus and Walmart's ONE financial services platform—are featured in large, "above the fold" placements, visible to a consumer immediately upon navigating to Walmart's homepage. In contrast, the Card Program is relegated to a narrow banner that a user can only see after scrolling all the way down to the bottom of Walmart's lengthy website.

23.  When Capital One confronted Walmart with these and other marketing failures, Walmart brazenly confirmed its refusal to live up to its contractual commitments. Walmart executives stated that there would be no meaningful efforts toward in-store marketing through Walmart associates because Walmart's internal priorities had changed. And Walmart likewise confirmed the Card Program was not lucrative enough to Walmart to merit prominent placement on Walmart's website, in particular on the Walmart.com homepage. According to Walmart, despite the Agreement's clear requirement that Walmart provide prominent marketing placements ██████████████ priority

placements on the Walmart.com website were reserved for vendors willing to pay Walmart additional advertising fees.

24. The effect of Walmart's marketing failures has been substantial: despite the fact that the Capital One card offered greater benefits and rewards than the earlier Synchrony card, the new accounts booked in the Card Program have been far below projections. For example, the Card Program has performed far below expectations, issuing only approximately ███████ cards in 2022 instead of the ██████ card goal forecasted by Walmart and accepted by the parties at the Card Program's outset. In-store card applications have also plummeted since 2019, falling from approximately ███████ in-store approved accounts annually for Synchrony to just approximately ██████ in-store approved accounts annually for the Capital One Card Program.

25. Walmart's repeated, bad faith refusals to adhere to its contractual marketing obligations have directly contributed to the Card Program's disappointing performance.

26. And after years of suppressing the Card Program's growth in favor of opportunities it believes to be more lucrative, Walmart has now gone a step further in its efforts to get out of the terms of the Agreement it agreed to just a few years ago by attempting to invent a right to terminate the contract early.

27. Walmart's purported termination right is nothing more than a pretext for its desire to escape the economic terms to which it agreed.

28. Walmart's interpretation is contrary to the plain language, broader context, and negotiating history of the Agreement. As Walmart cannot dispute, the servicing issues experienced by Capital One were addressed promptly as required by the Agreement and had no measurable cost to or impact on cardholders, Walmart, or on the Card Program.

29.     At bottom, this case has nothing to do with customer service issues and Critical SLA misses. Instead, this dispute is entirely about Walmart's desire to void its existing contractual obligations and strike another deal more to its liking.

30.     Walmart's assertion that it seeks expedited resolution of its claim for declaratory relief because of exigent concerns for cardholder service is belied by the fact that Walmart waited 86 days after receiving notice of a fifth Critical SLA miss to purportedly terminate the Agreement and file suit. During that 86-day period, Walmart tried, without success, to strong-arm Capital One into accepting substantially worse financial terms as a condition to continuing the partnership, with no mention of a need for Capital One to enhance its customer service performance. Walmart filed suit only when it became apparent that Capital One would not agree to rewrite the economic terms of the Agreement to Walmart's liking.

31.     Since filing this lawsuit, Walmart has taken its efforts to hamper the partnership even further. Upon information and belief, Walmart has taken steps to unilaterally end the partnership at the individual store level, instructing employees that Walmart's relationship with Capital One has ended and that they should not make any ongoing efforts to promote the Card Program in Walmart stores. Walmart's instructions to its employees violate the Agreement's ███████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████.

32.     Capital One respectfully requests that this Court (i) declare that Walmart has no right to terminate the Agreement early and (ii) award damages that will compensate Capital One

for the substantial economic injury incurred as a result of Walmart's persistent failure to meet its contractual marketing obligations.

## II.  PARTIES

33. Counterclaim Plaintiff Capital One is a national banking association with its principal place of business and main office located in the Commonwealth of Virginia.

34. Counterclaim Defendant Walmart Inc. is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

35. Counterclaim Defendant Wal-Mart Stores East, LP, is an entity organized under the laws of Delaware with its principal place of business in Bentonville, Arkansas.  It has two partners: WSE Management, LLC and WSE Investment LLC.  The sole member of both LLCs is Wal-Mart Stores East, LLC.  The sole member of Wal-Mart Stores East, LLC is Plaintiff Walmart Inc., which is a citizen of Arkansas and Delaware.

36. Counterclaim Defendant Wal-Mart Louisiana, LLC is a Delaware limited liability company with its principal place of business in Bentonville, Arkansas.  It has one member: Plaintiff Wal-Mart Stores East, LP, which is a citizen of Arkansas and Delaware.

37. Counterclaim Defendant Wal-Mart Stores, Texas, LLC is a Delaware limited liability company with its principal place of business in Bentonville, Arkansas.  It has one member: Wal-Mart Real Estate Business Trust, which is a Delaware statutory trust whose sole beneficial owner is Wal-Mart Property Co., which itself is incorporated in Delaware with its principal place of business in Arkansas.

38. Counterclaim Defendant Wal-Mart Stores Arkansas, LLC is an Arkansas limited liability company with its principal place of business in Bentonville, Arkansas. It has one member: Plaintiff Walmart Inc., which is a citizen of Arkansas and Delaware,

39. Counterclaim Defendant Wal-Mart Puerto Rico, Inc. is a Puerto Rico corporation with its principal place of business in Arkansas.

40. Counterclaim Defendant Wal-Mart.com USA, LLC is a California limited liability company with its principal place of business in Bentonville, Arkansas. It has one member: Plaintiff Wal-Mart Stores East, LP, which is a citizen of Arkansas and Delaware.

41. Counterclaim Defendant Walmart Apollo, LLC is a Delaware limited liability company with its principal place of business in Bentonville, Arkansas. It has one member: Plaintiff Walmart Inc., which is a citizen of Arkansas and Delaware.

### III. JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and the parties are diverse: Counterclaim Plaintiff's principal place of business is in Virginia and none of the Counterclaim Defendants are citizens of Virginia.

43. This Court has personal jurisdiction over Walmart because Walmart filed its First Amended Complaint in this District and thus has consented to personal jurisdiction in this Court.

44. The United States District Court for the Southern District of New York is a proper venue for this action because pursuant to Section 12.11 of the Agreement "any legal action or proceeding arising out of or in connection with this Agreement shall be brought in United

States District Court in the Southern District of New York . . .." The parties further agreed to irrevocably waive their right to trial by jury. Venue is also proper because Walmart filed its First Amended Complaint in this District, and thus has consented to venue in this Court.

## IV.     RELEVANT FACTS

**A.     Capital One and Walmart Enter into the Credit Card Program Agreement.**

45.     On July 23, 2018, Capital One and Walmart entered into the Agreement, which sets forth the terms of the parties' partnership to offer Walmart-branded Capital One credit cards.

46.     Previously, Walmart had offered branded credit cards through Synchrony. By mid-2018, however, that relationship had broken down.

47.     In mid-July 2018, the <u>Wall Street Journal</u> reported that Walmart was dissatisfied with the terms of its Synchrony partnership. Indeed, in November 2018, Walmart filed a breach of contract lawsuit against Synchrony, an apparent negotiation tactic to extract a better deal from Synchrony on the terms of the transitions of legacy cardholders when Walmart moved the overall relationship to another bank. The case ultimately settled in early 2019.

48.     With the demise of its relationship with Synchrony, Walmart needed a new partner but had limited options. It needed a bank that (i) was equipped to handle a card program of the size of Walmart's program, (ii) was not already working with one of Walmart's key competitors, Amazon or Costco, and (iii) had the technology to support Walmart in its broader goals, which included competing with Amazon's dramatic success in e-commerce.

49.     Capital One was the obvious and best choice given its ability to meet all of the criteria.

50.     On multiple occasions in 2018, Walmart's representatives reached out to convince Capital One to partner with Walmart. Capital One declined Walmart's representatives'

initial approaches but ultimately agreed to engage in diligence and negotiation with Walmart.

51. After negotiations involving senior executives and experienced advisors for both sides, the parties executed the Agreement. The Agreement was premised on both parties' commitment as partners to build and grow the Card Program. Importantly for Capital One, the Agreement also provided Capital One with protection from ████████████ ████████████████████████████████████████████████████████████████ ████████

52. The Agreement was signed on July 23, 2018. On July 26, 2018, Walmart and Capital One issued a joint press release announcing the "new, long-term credit card program agreement." The statement described Walmart and Capital One's "common goal" of "transforming the way they serve customers through digitally-led innovations," and looked forward to the companies working together to offer "credit card products that deliver great value to customers and an exceptional cardholder experience."

**B.     Key Provisions of the Agreement**

53. The Agreement and its appended exhibits and schedules—which before subsequent amendments spanned 214 pages—set forth the terms of the Card Program's operations, the economics for each partner, and other key issues, including:

a) Long Term Nature of the Card Program: The Agreement specifies a ██████ term following the launch of the Card Program. Consistent with a long-term partnership, the Agreement requires the parties to invest substantial time and resources in the Card Program. For example, Section 2.5 of the Agreement requires that, ███████████ ████████████████████████████████████████████████████████████████ █████████████████████████ The magnitude of the resources necessary for the

establishment of the Card Program is further reflected by the fact that it was not scheduled to launch for more than a year after the Agreement was signed.

b) <u>Upfront Investments in the Card Program</u>:  Pursuant to Article V of the Agreement, the parties █████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

c) <u>Promotion Obligations</u>:  As is typical for a partnership based on the sales of a shared product, the Agreement requires both Parties to ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███

d) <u>Termination Provisions:</u> ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

**C.**    **In the Fall of 2019, After More than a Year of Preparation, Walmart and Capital One Successfully Launch the Card Program.**

54.    Given the Card Program's complexity, the process of planning its launch spanned over a year.  Capital One invested ████████████████ as well as significant time and resources, ████████████████████████████████████ to ensure the Card Program's success.

55.    After more than a year of preparation, on September 18, 2019, Capital One and Walmart announced the Card Program's launch, which the companies jointly described in a press release as a "reimagin[ing] [of] the Retail Credit Card Program."

56.    Beginning on September 24, 2019, Walmart and Capital One offered two different cards, a Capital One Walmart Rewards Mastercard, and a "private-label card" exclusively for Walmart purchases, referred to as the Walmart Rewards Card.

57.    The joint press release announcing the Card Program launch highlighted the rewards offered by the Card Program, including, among other things, 5% back on purchases on Walmart.com and 2% back on purchases at Walmart physical stores.

58.    In announcing the new Card Program, a Walmart executive praised its "incredible benefits" as "squarely aligned" with the Company's mission of "help[ing] customers save money so that they can live better." The press release highlighted the "many digital tools" Capital One offered to card members, including real-time purchase notifications, security alerts, and fraud protections.

59.    The press release went on to emphasize the long-term nature of the companies' partnership, promising that "Capital One and Walmart will continue to innovate and add new products and capabilities to the program over time."

60.    In its Q4 2018 earnings call, Capital One emphasized the importance of Walmart's commitment to Capital One's willingness to enter into the Agreement. As Capital One communicated, Walmart's "commitment is absolutely necessary [] for this deal to be successful. And it was an important consideration for us as we entertained doing this partnership . . . we've been impressed with Walmart's intent relative to this thing."

**D.    After Praising the Card Program's Benefits at the Card Launch, Walmart Changes Course and Repeatedly Fails to Prominently Market the Card Program.**

61.    Prior to launch, Walmart and Capital One jointly set a goal of issuing ███████ ███████ by the end of 2022, the third year of the Card Program. This goal was based on Walmart's projections, which were provided to Capital One during negotiations in the Spring and Summer of 2018.

62.    The Card Program has fallen far short of this goal, issuing approximately ███████ ██████ cards annually in 2021 and 2022. Walmart's failure to market the Card Program

as required by the Agreement is the primary factor driving the Card Program's disappointing performance. As set forth below, Walmart's good faith commitment to promote the Card Program through all of Walmart's ███████████████████████ was vital to achieving the ██████████-card target.

63. Capital One has performed in good faith under the Agreement and has continually tried to work with Walmart—despite Walmart's failures—in an effort to find ways to unlock the value that both parties envisioned when the Agreement was signed.

64. Walmart, in contrast, has refused to work in good faith to grow the Card Program and instead breached the Agreement by failing to prominently market the Card Program on its digital platforms and in its physical store locations.

      **1.**     **The Agreement Requires Walmart to** ███████████████ **Market the Card Program.**

65. A major component of the Agreement was Walmart's obligation to ███████████ ████████████████████████████████████████ Given Walmart's reach, the parties understood this commitment was vital to the success of the Card Program.

66. Specifically, ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████

67. ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████

68.　　The Agreement also sets forth Walmart's ██████████████████████
███████████████████████████████████████████████████
███████

69. ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████
██████████████████████████████
██████████████████████████████████████████

70.　　Following the launch, Walmart was also required to ████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████

### 2. Walmart Breaches Its Obligation to ███████████ ███████████ Market the Card Program in Physical Walmart Stores.

71.    From immediately after the Card Program's launch, Walmart has failed to live up to its contractual commitments to market the Card Program in Walmart stores. Walmart's failures included its refusal to incentivize its stores to promote the credit cards relating to the Card Program, failure to train in-store employees to promote the credit cards relating to the Card Program, and failure to ensure Card Program signage was displayed in physical stores.

72.    The direct engagement of Walmart's in-store customers was central to the parties' expectations about the Card Program's growth potential and overall success. Indeed, in seeking out Capital One as a potential partner, Walmart repeatedly touted the benefits of its (at that time) 5,400 stores nationwide with access to 140 million in-store weekly customers.

73.    Walmart projected massive growth of the Card Program based in large part on that in-store traffic and customer loyalty. In the parties' exploratory, initial discussions, Walmart provided data regarding historical credit card volumes that included substantial in-store sales. In reliance on Walmart's projections of robust in-store Card Program sales and ███████████████████████████████████ Capital One spent millions of dollars hiring and training its own 50+ person in-store sales force to support in-store sales at thousands of Walmart physical stores.

74.    However, Walmart has failed to live up to its contractual obligations to promote the Card Program to its in-store customers, a failure that has led to in-store card applications falling dramatically below the parties' expectations when the Agreement was signed.

75.     As one example, in September 2018, Capital One learned that as of August 1, 2018 (just 9 days after signing the Agreement), Walmart—without any notice to or input from Capital One—had ended the incentive programs that it had previously used to encourage in-store employees to promote branded credit cards to in-store customers.  Given the number and size of Walmart stores, store-based incentive programs were critical to encouraging store personnel to promote the card to in-store shoppers.  Indeed, the data and projections provided by Walmart during negotiations of the Agreement were based in substantial part on the results of those incentive programs.

76.     Rather than offer benefits to store employees for promoting the Card Program, Walmart began rewarding in-store employees for "check out" speed, encouraging store employees to handle purchase transactions at Walmart registers as quickly as possible. Unsurprisingly, these new incentive programs discouraged in-store employees from promoting the Card Program, as it takes additional time to inform a Walmart customer about the benefits of the Card Program.

77.     As was obvious to Walmart, without incentive programs store associates would have less reason to talk to customers about the Card Program, making promotion of the Card Program by Walmart employees far less likely and far less effective.

78.     Walmart's revisions to its in-store incentive programs—and subsequent refusal to offer any kind of in-store framework to meaningfully support Card Program sales—left Capital One's new salesforce without Walmart personnel to partner with and deprived Capital One of an important driver of card sales. ██████████████████████████

██████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

79.     When Capital One raised the lack of an incentive program to Walmart, Walmart personnel confirmed Walmart's unwillingness to live up to its [REDACTED]

[REDACTED] Specifically, Walmart personnel conveyed to Capital One's team that no meaningful store program for the foreseeable future was available because Walmart wanted to focus on other (non-Card Program) priorities. Indeed, in communications from early February 2021, Walmart executives made clear to Capital One leadership that any store incentive or other associate engagement program was "off the table" despite Walmart's contractual commitments.

80. Compounding this breach, Walmart failed to adequately train and educate its in-store employees about the Card Program. Despite the obligations [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Walmart repeatedly failed to invest time and resources in training employees on the Card Program.

81.     As another example, Capital One employees learned from site visits that, when asked about financial programs, Walmart's store personnel often knew nothing about the Card Program and were unable to answer basic questions about its offerings. Indeed, in response to questions, Walmart personnel often shared information about Affirm, a buy now pay later program that had nothing to do with the Card Program.

82.     Capital One repeatedly raised Walmart's failures to live up to its in-store marketing obligations to the Walmart team.   Among other conversations, in July 2022 communications with Walmart, Capital One noted that the failure to properly train store personnel and their provision to customers of information regarding Affirm rather than the Card Program, was resulting in fewer in-store card applications and much lower profits than had been projected at the time of the Card Program's launch.

83.     Moreover, Capital One has struggled to secure Walmart's cooperation to ensure ███████████████████████████████████████████████████████ ████████████████   As one example, Capital One learned through site visits to Walmart stores that old signage for the Synchrony-branded card had not been removed, which had been replaced by the Capital One Card Program.  In fact, despite Capital One raising this issue to Walmart on numerous occasions, old Synchrony card advertisements were still found in Walmart stores *years* after the Card Program's 2019 launch.

84.     Visits to Walmart locations frequently revealed inconsistent placement of the Card Program advertisements. Some stores had little to no signage.   Some stores had advertisements at check-out but still presented problems because Walmart associates were not adequately trained on the Card Program to answer any questions in response to the advertisement.

85.     Walmart also often had signage for other financial services programs in locations that were supposed to contain Card Program advertisements.  As demonstrated in the photo below taken during a 2022 store visit, the Card Program advertisements in store were sometimes covered over by advertisements for other Walmart financial programs, such as check cashing:



86.    By 2023, the placements of the Card Program at the self-checkout ("SCO") screens were inconsistent, often outdated, and relegated to unsold inventory due to Walmart's increasing efforts to monetize higher quality marketing placements. ███████████



87.    The effect of these failures on the Card Program has been dramatic.  Despite the Capital One Card Program having greater consumer benefits and rewards than the earlier Synchrony program as heralded in the press release announcing the Program's launch, in-store card applications plummeted during the Capital One Card Program.

88.    While approximately ████████ in-store approved accounts were generated annually for Synchrony, only about ███████ in-store approved accounts were generated annually for

the Capital One Card Program.  This is directly attributable to Walmart's failure to promote the Card Program in Walmart stores in the manner required by the Agreement.

### 3. Walmart Stops ████████ Advertising the Card Program on Its Website.

89.    Another critical feature of the Agreement for Capital One was Walmart's commitment and assurance that the Card Program would be integral to and benefit from the expansion of Walmart's e-commerce channels and online outreach to customers.  Since no later than early 2021, Walmart has been in breach of its obligation to ████████ market the Card Program on Walmart.com.

90.    Immediately after the Card Program's launch in late 2019 and early 2020, Walmart appeared to be at least working towards meeting its online marketing requirements.  Card Program promotion was visible on the "front page" of the Walmart.com website, as this example from October 1, 2019 demonstrates.



91.     At Capital One's request, Walmart tested and tracked the effectiveness of different methods of customer outreach in encouraging credit card applications. The results of these efforts were clear and unsurprising: where (and when) Walmart lived up to its commitment to ████████ market the Card Program on its website and through other marketing strategies, card applications dramatically increased.

92.     However, in March of 2020, Walmart launched a revamping of its digital platform known as "Glass." Despite the fact that a project of this scale no doubt required months, if not years, of planning, Capital One had no advance warning of Walmart's planned changes. Walmart's credit card team—charged with liaising with Capital One's marketing team— was unable to provide any guidance about how the changes would affect marketing of the Card Program.

93.     Once Capital One learned of the launch of "Glass," Capital One began to raise concerns about Walmart's adherence to its marketing commitments. For example, during meetings between the companies' executives in July 2020, Capital One previewed for Walmart the decrease in new card applications the Card Program would experience in the event that "Glass" did not include the priority card placements.

94.     Notwithstanding Capital One's efforts, the effect of Walmart's switch to "Glass" was soon evident: the Card Program was no longer ████████ placed on Walmart's website.

95.     By January 2021, the banner had moved from the featured placement at the top of the webpage and instead appeared in a smaller box, as marked by the red square and arrow below, not visible to a user first opening the website, as this example from March 2021 demonstrates:



96. Capital One continued to raise concerns about its digital placements to Walmart, including in early 2021 meetings. In particular, Capital One emphasized to Walmart that card originations decreased where the ad placement was "below the fold" of the Walmart.com homepage, meaning that an advertisement was not visible to a consumer immediately upon opening a website.

97. As Capital One relayed to Walmart, its current website placements were "dramatically worse" than the ones Walmart had allocated to the Card Program previously.

98. The situation became even worse once Walmart's migration to Glass was complete in late 2021: the Card Program was promoted only on a small banner at the bottom of the Walmart.com website, a decision that Walmart knew from the parties' testing would generate substantial decreases in customer engagement. This small banner was not

███████████████████████████████████████

99. An example from December 1, 2021 is below, with the Card Program link buried far "below the fold" and requiring a user to scroll more than halfway down the opening webpage before encountering the narrow banner, as marked by the red square and arrow below:



100. Over the course of 2022, the placement of the narrow ribbon linking to the Card Program website was consistently far "below the fold" on the Walmart.com homepage.

101. Walmart's intentional placement of the Card Program link in obscure and ineffective places on its website is especially evident when compared to its treatment of other Walmart programs. For example, Walmart's own ONE debit Mastercard—which has no relation to the Card Program with Capital One—is highlighted on the financial services section of the Walmart.com website, as this screenshot from April 2023 illustrates:



### 4. Walmart Concedes Its Marketing Failures Stem From Its Dissatisfaction with the Economic Terms of the Card Program.

102. Throughout the tenure of the Card Program, Walmart put forth multiple justifications for its failures to meet the marketing obligations imposed by the Agreement, ultimately admitting that marketing the Card Program in the manner required by the Agreement was not a priority for Walmart because of its dissatisfaction with the financial terms of the deal.

103. When Capital One raised Walmart's marketing failures, Walmart first offered excuses. For example, when Capital One escalated its concerns about its online marketing placements, Walmart first blamed the problems on its change to the Glass platform,

claiming that its team was overwhelmed with other projects as a result of the system change. According to Walmart, advertising the Card Program on Walmart's digital channels was at the "back of the line," notwithstanding Walmart's contractual obligations to ▮▮▮▮▮ market the card.

104. As these problems persisted and Capital One's complaints increased, Walmart offered a different answer, claiming that the Card Program's offerings were not sufficiently "new" or enticing to get prominent placement on Walmart's website and in-store locations, again, ignoring the requirements of the Agreement.

105. In meetings and other communications with Walmart, Capital One's marketing team eventually learned the real reason for Walmart's marketing failures: Walmart did not believe the terms of the Agreement were sufficiently favorable to justify any real investment by Walmart in advertising the Card Program. Rather than devote the contractually-required resources to promote the Card Program, Walmart prioritized other financial products, including new strategic initiatives commenced after it entered into the Agreement such as the Walmart Plus membership program launched in September 2020 and the Walmart ONE financial services products.

106. Walmart ONE first began to take shape publicly in early 2021 when Walmart hired two senior bankers from Goldman Sachs to run a new financial technology joint venture startup. According to news reports, Walmart holds the largest stake in the joint venture and the board includes top Walmart executives. In January 2022, Walmart's plans accelerated. The joint venture acquired ONE Finance Inc., a start-up neobank, and another fintech company, and rebranded itself as ONE. ONE offers debit cards, checking

and savings accounts and reportedly plans to introduce a buy now pay later product later this year.

107.    Upon information and belief, Walmart intends to offer its branded credit cards through ONE in the future.  According to ONE's CEO "the strategy is to build a financial services super app, a single place for consumers to manage their money" and the partnership with Walmart offers a huge potential customer base.  This, of course, was the promise of Capital One's partnership with Walmart.  With ONE, Walmart is positioning itself to compete directly with Capital One to provide credit and payment products to Walmart customers.

108.    Walmart's response to Capital One's concerns about online marketing are indicative of Walmart's overall attitude towards the Card Program. When Capital One raised Walmart's failure to ▮▮▮▮▮▮ promote the Card Program on ▮▮▮▮▮▮ Walmart pointed to recent increases in online sales through Walmart's website, Walmart.com.  While Walmart had repeatedly made efforts to grow its e-commerce business—for example, acquiring online retailer Jet.com in 2016 as a way to jump start its online presence—Walmart was nonetheless unhappy with the effect of this growth on the Card Program, which provided higher rewards for online purchases.  When Card Program customers received 5% cash back for purchases at Walmart.com, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

109.    By mid-2021, in response to further Capital One complaints about Walmart's marketing failures, Walmart made it even more explicit to Capital One that the current Card Program was not attractive enough to Walmart for it to fulfill its marketing commitments.

110. In particular, Walmart told Capital One that if it was dissatisfied with the space allocated on Walmart.com to promote the Card Program, Capital One would have to *buy* prominent advertising space from Walmart's newly-launched advertising business.

111. ██████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
Walmart's insistence on additional consideration before it would live up to its end of the bargain breached its contractual obligation.

112. Capital One was unwilling to make such additional payments it had no contractual obligation to make. As a result, the Card Program received—at best—the "leftover" advertising placements that Walmart is unable to sell to other customers, advertisements that are generally "below the fold" and therefore are not visible. These placements breached Walmart's obligation to ████████ promote the Card Program on its website.

113. Walmart executives eventually confirmed that there was no top-level motivation by Walmart leadership to invest resources and effort in the Card Program, stating that Walmart viewed the Program as "fundamentally flawed in setup" and that there was no "internal support for a program that doesn't make any money" despite the fact that as of February 2023 Walmart had received approximately ████████ in direct payments from the Card Program.

114. In February 2023, a Walmart senior executive admitted to a Capital One senior executive that the disappointing performance of the Card Program was caused more by issues at Walmart than by any issues at Capital One. Another Walmart senior executive

acknowledged to a Capital One senior executive in February 2023 that "if we can't make [a card partnership] work with you, we can't make it work with anyone."

115. Walmart's persistent breaches of its marketing obligations under the Agreement have caused direct financial harm to Capital One. In particular, the Card Program has failed to come anywhere close to the goals Walmart and Capital One set before the product launch—goals that could and would have been achieved if Walmart had complied with its marketing obligations. As of 2022, the Card Program is producing less than ███ ███ cards per year, far short of the ███████ annual cards that were reasonably projected at the time of the launch.

116. Furthermore, as described above, Capital One has expended massive resources on the implementation, launch and ongoing support of the Card Program████████████████ ██████████████████████████████████████████

### E. Walmart Manufactures a Right to Prematurely Terminate the Card Program Based on SLA Misses.

117. After years of repeated and worsening violations of its contractual obligations to promote the Card Program because it no longer likes the bargain it agreed to, Walmart has now sought an early termination of the Card Program in a gambit to exit the Agreement and deny Capital One the benefit of the bargain.

118. While Walmart has persistently refused to meet its obligations under the Agreement as described above, Capital One has done the opposite, continually seeking to partner with Walmart to grow the Card Program, to find ways—notwithstanding the lack of any contractual obligation to do so—to address Walmart's financial concerns.

119. In particular, Capital One has sought in good faith to service cardholders consistent with the customer service standards set forth in the Agreement and consistent with the Capital

One brand. As described above, these standards, which govern many aspects of a cardholder's experience, including the call center, the Card Program website, card replacements, statement production, and payment processing, are designated as either "Non-Critical SLAs" or "Critical SLAs" under the Agreement.

120. Pursuant to the Agreement, Capital One provides monthly reports to Walmart regarding Capital One's performance for each SLA. Each report lists all SLAs, their substantive thresholds and targeted rates of compliance, and Capital One's actual rate of compliance.

121. If a Critical SLA is not met in a given month, the Agreement provides for (i) a notice to Walmart, (ii) an action plan to remediate the failure, (iii) then financial penalties depending on the timing and number of repeated failures with respect to that particular Critical SLA, and (iv) ultimately a right to terminate if a specific Critical SLA has not been met five times in a rolling 12-month period. These escalating consequences are aimed at remediating the causes of the underlying issues and preventing future failures to meet that SLA.

122. This is a standard structure in long-term credit card partnerships, designed to provide transparency, mitigation of any failures, and overall cooperation to ensure the success of the partnership, not to permit shortcut terminations when one party is unhappy with its economic share.

123. Specifically, the Agreement provides as follows:

   a) The failure to meet an SLA first gives rise to an "Initial Failure," and Capital One must notify Walmart "in reasonable detail" about the failure and provide a written action plan to cure the failure and prevent its reoccurrence. Capital One must

then implement the action plan and deliver a second report to Walmart "assessing the results of the plan."

b) If Capital One fails to meet the same Critical SLA in any of the rolling 12 calendar months immediately following an Initial Failure, then Capital One must pay ▮▮▮▮▮ to Walmart.

c) If Capital One "fails to meet the same Critical SLA in the consecutive calendar month following the Initial Failure with respect to such Critical SLA," Capital One must pay a monetary penalty to Walmart of between ▮▮▮▮▮▮▮

d) Finally, "[i]f [Capital One] **fails to meet a Critical SLA, five or more times in a rolling 12 calendar month period** (each such SLA miss, a "Major Service Failure"), Walmart may terminate the Agreement." (emphasis added.)

### F. Capital One Self Reports Five Instances of Three Different Critical SLA Misses.

124. Consistent with its obligations under the Agreement, Capital One has steadfastly followed the procedures agreed upon by the parties to monitor, self-report, and remediate any Critical SLA misses. From August 2022 to January 2023, Capital One reported five Critical SLA misses: three of SLA 19 (June, July, and August 2022) and one each of SLA 14 (November 2022) and SLA 16 (August 2022).

125. As described below, none of these failures resulted in any measurable harm to Walmart or cardholders, and Walmart generally gave no substantive response to Capital One's notification of the failures as they were reported.

126. **Critical SLA 19:** On August 16, 2022, Capital One self-reported that it had failed to meet SLA 19 in July 2022. SLA 19, which is a Critical SLA, requires Capital One to post 97% of conforming payments within one business day of receipt, post and process

99% of non-conforming payments within five business days of receipt, and post 99.9% of electronic conforming payments by the next business day.

127.    The July 2022 SLA miss was the result of a cyber incident involving a vendor that was discovered on June 19, 2022, and was beyond Capital One's reasonable control.   Upon learning of the cyber incident, the vendor took steps to bring its systems down and contain the threat; however, approximately 45,000 payments were not processed during the time the vendor's systems were taken offline.  Capital One promptly implemented its business continuity plan under which payments were transferred to a different vendor. The replacement vendor provided processing services for approximately 8 weeks while Capital One's main vendor investigated the incident and completed extensive testing to ensure the security of its systems.

128.    Capital One's prompt change of vendors ensured the security of cardholder data. However, it resulted in delayed payment processing for the month of July 2022: 55.24% of conforming payments were processed within one business day, and 76.4% of non-conforming payments were processed within five business days.   In accordance with Schedule 4.13, Capital One informed Walmart of its written action plan to address the issue, and customer payments were credited and fees were adjusted as needed. There was no financial impact to any customer or to Walmart as a result of this issue and after the vendor's cyber incident was resolved and security confirmed, the original vendor began processing payments as expected again on August 8, 2022.

129.    On September 16, 2022, Capital One self-reported that it had failed to meet SLA 19 again in August 2022 as a result of the change in vendor (due to the same cyber incident) described above.   Because Capital One's original vendor was not "cleared" to resume

processing until August 8, processing times were slower for August as well, with 86.4% of conforming payments being processed within one business day, and 87.89% of non-conforming payments being processed within five business days. In accordance with Schedule 4.13, Capital One informed Walmart of its written action plan, confirmed that the issue was resolved on August 8 and reported that the SLA metrics from August 9 through August 31 were met. Customer payments were processed and fees adjusted accordingly. Pursuant to its obligations under Schedule 4.13(III), on September 20, 2022, Capital One made a payment of ████ to Walmart because it was the second failure of SLA 19 within the two-month span of July and August 2022.

130. On January 11, 2023, Capital One self-reported that, based on additional research, it determined that Capital One had also failed to meet SLA 19 in June 2022, when the vendor's cyber incident described above first arose. Specifically, in June 2022, 89.87% of conforming payments were processed within one business day, and 92.13% of non-conforming payments were processed within five business days. In January 2023, Capital One once again made a payment of ████ to Walmart because its further research revealed that it had missed SLA 19 twice within the two-month span of June and July 2022.

131. As described above, all three failures to meet Critical SLA 19 in June, July and August of 2022 stemmed from a vendor's single cyber incident and Capital One's resulting move to a different vendor to ensure the safety and security of cardholder data. Again, there was no financial impact to any customer or to Walmart as a result of the three failures. By August 8, 2022, the issue had been fully addressed and has not recurred in the approximately nine months since.

132. **Critical SLA 16:** On September 16, 2022, Capital One self-reported that it had failed in August 2022 to meet Critical SLA 16, which requires the mailing of 99.9% of replacement credit cards within five business days. In August 2022, employee absences at Capital One's replacement card vendor had spiked due to COVID-19, impacting the vendor's ability to run the card-replacement machines at full capacity. As a result, the mailing of approximately 1900 cards was delayed. Upon investigation, Capital One learned that as a result of the vendor's COVID-related staffing shortage, which was beyond Capital One's reasonable control, **98.01**% of replacement cards, rather than **99.9**%, were mailed within five business days. Notwithstanding the vendor's COVID-related staffing shortage, 100% of the relevant customers received their cards within the seven to ten business day window communicated to customers. Moreover, Capital One worked with its vendor to resolve the COVID-19 related staffing problem and by the next month 100% of replacement cards were mailed within five business days.

133. **Critical SLA 14:** On December 15, 2022, Capital One self-reported that in November 2022 it had failed to meet Critical SLA 14, which requires Capital One to post 99.9% of transactions received on processing days by the close of the following posting day. Capital One had migrated its settlement process to a new vendor in mid-2022. On November 1, 2022, Capital One identified a coding "bug" that caused the date to be converted incorrectly to January 1, 2001. The one-time coding error caused 47,000 transaction postings to be delayed, resulting in **99.83**%, rather than **99.9**%, to be posted by the close of the following posting day. In accordance with the obligations set forth in Schedule 4.13(III), Capital One notified Walmart that a fix was made on November 2, 2022 to correct the error. Transactions were posted as expected for the remainder of the

month, and no customer experienced any harm or penalty as a result of this one-time issue. This is the only instance in which Capital One has failed to meet Critical SLA 14.

134. Prior to the January 2023 notification, Capital One had been voluntarily negotiating with Walmart in good faith for several months to determine whether a mutually-agreeable way to adjust the economic terms of the Card Program was to address possible Walmart's continuing concern with the deal that Walmart had struck in 2018. Once the January 2023 Critical SLA notification was provided by Capital One, however, Walmart reconsidered its stance in these economic renegotiations and asked for dramatically improved economics relative to both the existing contract and the proposed adjustments that the parties had been discussing. During these discussions, Walmart was laser-focused on improving the economics of its deal with Capital One, rather than mitigating any concerns it might have had about any SLA issues.

G. **Walmart Does Not Have a Contractual Right to Terminate the Agreement.**

135. Walmart asserts—contrary to the plain language of the Agreement—that it is entitled to terminate the Agreement early because of the five Critical SLA misses described above.

136. Walmart's intentional misreading of the Agreement is nothing more than a transparent attempt to manufacture a way out of the Agreement without having to compensate Capital One for the benefit of the ███████ bargain the parties struck.

137. The plain language of the Agreement permits termination only if a Critical SLA miss occurs five or more times in a rolling 12-month period, which has not occurred here. Because no triggering event pursuant to Schedule 4.13 has occurred, the Agreement remains in full force and effect.

138. Walmart intentionally misconstrues the phrase "fails to meet a Critical SLA, five or more times" in Schedule 4.13(III)(5) to permit Walmart to terminate the Agreement if *any* five Critical SLAs occurred during a 12 calendar month period.

139. Walmart's interpretation is wrong for several reasons, including but not limited, to the following.

140. First, under the plain language of Schedule 4.13(III)(5) the phrase "fails to meet *a* Critical SLA, five or more times" refers to the *same* Critical SLA being missed five or more times. "A Critical SLA" is a singular formulation, not a plural one.

141. This plain reading is confirmed by the placement of the comma separating "a Critical SLA" from "five or more times," which makes clear that "five or more times" modifies "a Critical SLA," and does not mean five or more of any combination of Critical SLAs. Walmart's interpretation of the clause would render the comma meaningless.

142. Additionally, the Agreement confirms that "a" does not mean "any" because where the Agreement means "any" SLA, it explicitly says so. *See* Schedule 4.13(IV)(3) ("Walmart shall provide Bank with as much notice as reasonably practicable regarding any action(s) that Walmart has taken or plans to take that could reasonably affect Bank's ability to meet *any SLA* . . . if Walmart fails to provide a 45-day notice in accordance with the preceding sentence, then Bank shall not be deemed to have failed to meet *any SLAs* for purposes of the Agreement."); Schedule 4.13(III)(4) ("[T]hat Bank shall pay the highest monetary penalty applicable to *any one of the failed SLAs*.") (emphases added).

143. Second, Schedule 4.13 is carefully constructed so that Walmart's option to terminate arises only as the culmination of a contractual regime of notice obligations, remediation opportunities, and financial penalties for repeated failures to meet a single SLA. The

right to terminate for repeated failures is the last resort, available only if the Agreement's escalating series of consequences has been completed and a given problem still cannot be prevented from recurring.

144. Walmart advances a counter-textual interpretation that would negate the Agreement's carefully calibrated escalating regime.

145. As detailed above, the obvious design of Schedule 4.13 with respect to failures to meet "a Critical SLA" was to impose escalating consequences—notice and an action plan to remediate, monetary penalties depending on the timing of a second, third, or fourth successive failure, and finally Walmart's right to terminate—for the fifth recurring failure by Capital One of a single Critical SLA.

146. If, as Walmart asserts, five failures to meet *any* of the thirteen Critical SLAs within a single twelve-month rolling period could give rise to the termination right, then Walmart would have the ability to terminate the Agreement on the basis of five separate "Initial Failures" even if those failures were immediately remediated pursuant to the Agreement's terms.

147. For example, under Walmart's reading, Walmart would be afforded the right to terminate a ██████████ agreement on December 1st if five different Critical SLA misses were self-reported on October 1st even though they were fully and permanently remediated by November 1st with no harm to Walmart or a single cardholder.

148. Walmart's interpretation would lead to the illogical result that the most dire penalty contemplated by the Agreement — early termination of a relationship contemplated to last ██████ and requiring enormous investments of time and resources — could be

invoked without any opportunity to cure the issue, without any intermediate monetary penalty, and without any financial or other harm to Walmart or its cardholders.

149. Here, the escalating provisions of the Agreement worked exactly as they were intended. The failure of SLAs 14 and 16 occurred one time each and immediately notice was provided and an action plan developed. The three SLA 19 failures were all the result of a single cyber incident on Capital One's vendor that caused payment processing issues from June 19 until August 8, 2022. Capital One reported the issue, provided a remediation plan, and paid ███████ in financial penalties as required by the Agreement.

150. Walmart's contrived interpretation that these failures nonetheless provide Walmart with the unilateral right to scuttle the entire Card Program is contrary to both the letter and the spirit of the Agreement.

151. <u>Third</u>, Walmart's interpretation of the termination provision would render nonsensical the term "Major Service Failure," which is used both in that provision (Schedule 4.13(III)(5)) and in Section 4.13(b) of the Agreement.

152. Section 4.13(b) of the Program Agreement provision states: "As and to the extent set forth in <u>Schedule 4.13</u>, Bank shall make payments to Walmart in the event of a Major Service Failure. Walmart may terminate this Agreement as provided under <u>Schedule 4.13</u>." Under Capital One's reading of the termination provision in Schedule 4.13, this provision makes perfect sense. Specifically, a Major Service Failure can occur only when there is a failure to meet *the same* Critical SLA five or more times in a 12-month period, requiring (among other things) the payment of monetary penalties.

153. By contrast, the phrase "Major Service Failure" in Section 4.13 of the Agreement makes no sense if Walmart's interpretation of the termination provision is accepted.

Specifically, Walmart asserts that *any* 5 Critical SLA misses in a 12-month period give it a right to terminate.  If Walmart is right, that means that five Critical SLA misses in the same month constitute a "Major Service Failure," even if they are all cured by the next month.   If that construction of "Major Service Failure" is accepted, it produces the following anomaly: According to the section 4.13 of the Program Agreement, when five different Critical SLAs are not met in a single month, that is a "Major Service Failure" and Capital One "shall make payments" "as and to the extent set forth in Schedule 4.13."  But Schedule 4.13 sets forth *no such payments* in that scenario; it sets forth payment penalties only for successive failures of *the same* Critical SLA.

154.   Thus, Walmart's reading of the termination provision in the schedule cannot be squared with the terms of the corresponding provision of the Agreement.  Section 4.13 of the Agreement makes sense only if the termination provision in the schedule is interpreted consistent with its text, that is, it refers to the failure to meet "a Critical SLA, five or more times …,"  that is, the same Critical SLA, five or more times.  Because one tenet of contract interpretation is to construe provisions so they all make sense, Capital One's interpretation of the termination provision is right for this additional reason.

155.   Fourth, Walmart's interpretation of Schedule 4.13 ███████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

156.   ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████

157. Walmart's interpretation—that any combination of five Critical SLA misses, including first time failures (no matter how insignificant), could trigger a termination right with no opportunity to cure—is entirely inconsistent with the other provisions in the remainder of the Agreement.

158. In contrast, Capital One's interpretation, which permits Walmart a termination right only if a Critical SLA miss occurs five or more times in a rolling 12 calendar month period such that the remediation processes set forth in the Agreement have failed to remedy a recurring issue, is consistent with the other termination rights provided in the Agreement. It permits termination for Critical SLA misses ██████████████████████████ ████████████████████████████████

159. <u>Finally</u>, the negotiation history of Schedule 4.13 makes clear that Walmart's interpretation of the "fails to meet a Critical SLA, five or more times" contractual language is incorrect.

160. The Agreement was negotiated during the summer of 2018, and counsel for Walmart and counsel for Capital One exchanged drafts of various portions of the Agreement, including Schedule 4.13.

161. In early versions of Schedule 4.13 circulated to the parties via email on July 16, 2018, Walmart introduced the term "Initial Failure" in describing the consequences of an SLA miss, defining that term as the first instance in which Capital One experienced an SLA miss.

> 1. Within 3 Business Days after the end of any month which Bank has failed to meet an SLA ("**Initial Failure**"), Bank will notify Walmart in reasonable detail as to the root cause for such Initial Failure, and will promptly take any action reasonably necessary to correct and prevent recurrence of such failure(s).

162. The Penalty structure then escalated from that Initial Failure, culminating in a "Termination Right" provision that specified the SLA calculation began "inclusive of the month in which the Initial Failure occurred.":

> 5. Termination Right:  If (i) Bank fails to meet or exceed a Non-Critical SLA for 6 consecutive months (inclusive of the month in which the Initial Failure occurred) or fails to meet a Critical SLA 5 or more times in a rolling 12-month period (inclusive of the month in which the Initial Failure occurred) (each such SLA failure, a "**Major Service Failure**"), Walmart may terminate the Agreement.

163. After several other iterations of the document, by an email dated July 18, 2018, Capital One's counsel provided edits to Walmart's draft of Schedule 4.13, striking Walmart's proposal that its termination right be triggered by a fourth consecutive SLA miss following two prior consecutive month failures of "such requirement."  The language of the provision, when read with the deleted clause, leaves no doubt the intention of both sections was meant to refer to repeated failures of a singular SLA.

> 4. Termination Right:  If (i) Bank fails to meet or exceed a Non-Critical SLA during the fourth (4th) consecutive month following a two (2) consecutive month failure of such requirement or fails to meet a Critical SLA 5 Bank fails to meet a Critical SLA five or more times in a rolling 12- calendar month period (each such SLA failure, a "**Major Service Failure**"), Walmart may terminate the Program Agreement, subject to the other terms of the Program Agreement.

164. Walmart's next draft sent later that day accepted this change, proposing the provision read as follows:

> 5. <u>Termination Right</u>: If Bank fails to meet a Critical SLA five or more times in a rolling 12 calendar month period (each such SLA failure, a "**Major Service Failure**"), Walmart may terminate the Agreement. In order to be effective, the notice of termination must be delivered within 90 days after Walmart learns of such fifth Critical SLA failure.

165. Capital One's next draft, sent on July 19, 2018, added the comma after "a Critical SLA," confirming that the language refers to a single SLA.

> 5. <u>Termination Right</u>: If Bank fails to meet a Critical SLA, five or more times in a rolling 12 calendar month period (each such SLA failure, a "**Major Service Failure**"), Walmart may terminate the Agreement. In order for such termination to be effective, the notice of termination must be delivered within 90 days after Walmart learns of such fifth Critical SLA failure.

166. Walmart accepted this change and the language above was used in the Agreement executed in late July 2018.

167. The SLA misses provision was drafted based on an explicit understanding that it would be difficult for a party to terminate the agreement.

168. This negotiating history is consistent with the parties' broader negotiations, which explicitly included discussions that termination was the "nuclear option" given the complex nature and resources required for a credit card partnership like this one.

169. Walmart's 2023 interpretation—that a termination right could be immediately triggered as a result of unrelated issues arising in a single month—is not consistent with this negotiating history.

**Walmart Wrongfully Demands That Capital One Renegotiate the Agreement's Terms Under Threat of Termination.**

170.    In early 2023, Walmart first approached Capital One with its baseless claim that the last of the five critical SLA misses described above gave Walmart a right to early termination of the Agreement.

171.    Focusing on escaping the deal's economic terms and not on any purported concerns about Capital One's customer service, Walmart offered to continue the Agreement only if Capital One agreed to fundamentally change the parties' agreed-upon financial arrangement.

172.    Capital One strongly disagreed with Walmart's asserted termination right but—recognizing that Walmart was wholly uncommitted to the success of the partnership as described above—was willing to negotiate in good faith possible changes to the Agreement.   However, Capital One made clear that any changes to the Agreement's terms would be agreed to only if Walmart fairly compensated Capital One for the benefit of the bargain struck in the Agreement.

173.    Walmart refused, demanding—unsuccessfully—that Capital One make major financial concessions in order to keep the partnership in place, as well as assigning the Agreement to Walmart's partially owned financial services affiliate, ONE.   That Walmart sought to obtain the improved financial terms—with no mention of any meaningful concerns about Capital One's performance—confirms that Walmart's real purpose for commencing this litigation has nothing to do with SLA misses.

174.    On April 6, 2023, Walmart sent Capital One the purported notice of termination seeking to terminate the Agreement, 86 days after the last Critical SLA miss was reported by

Capital One, and just three days prior to what Walmart believed to be its contractual deadline for notifying Capital One of its alleged early termination right.

175. Walmart thus spent 86 days of the 90-day notice period trying to renegotiate the economics of the deal. When it failed to get what it wanted, it changed course and is now seeking to use litigation in federal court to manufacture an early termination right based on servicing issues that have been fully remediated.

I. **Walmart Has Told Employees That the Credit Card Program Has Ended.**

176. On information and belief, since filing this lawsuit, Walmart has instructed its employees that the Card Program is over, and that its partnership with Capital One has ended. Walmart has told in-store employees to stop promoting the Card Program and to stop providing Card Program-related training to employees.

177. Pursuant to the Agreement's termination provisions, ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████

178. Walmart's instructions to its employees to stop promoting the Program in its stores is in flagrant breach of this provision and demonstrative of the bad faith that has influenced its failure to perform its obligations for years.

**FIRST CAUSE OF ACTION – DECLARATORY JUDGMENT**

179. Capital One repeats and realleges each and every allegation above as if fully set forth herein.

180. Schedule 4.13(III)(5) of the Agreement provides that Walmart may terminate the Agreement "if Bank fails to meet a Critical SLA, five or more times in a rolling 12 calendar month period . . ."

181. Schedule 4.13 permits termination only if there are five failures of a single Critical SLA in a rolling 12-month period.

182. From August 2022 to January 2023, Capital One self-reported three failures of Critical SLA 19 (June, July, and August 2022), one failure of Critical SLA 14 (November 2022), and one failure of Critical SLA 16 (August 2022).

183. On April 6, 2023, Walmart sent an invalid notice of termination based on an incorrect interpretation of the Agreement. Walmart wrongly construes the phrase "fails to meet a Critical SLA" to permit Walmart to terminate the Agreement if any combination of five Critical SLAs are not met during a 12 month period.

184. The parties' dispute represents a definite, substantial, concrete, actual, and immediate controversy between the parties.

185. The controversy cannot be resolved without intervention of the Court.

186. Capital One is therefore entitled to a declaration that no triggering event has occurred pursuant to Schedule 4.13 of the Agreement, Walmart's purported termination of the Agreement is invalid, and the Card Program Agreement remains in full force and effect.

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT FOR MARKETING FAILURES

187. Capital One repeats and realleges each and every allegation above as if fully set forth herein.

188. Capital One and Walmart entered into a valid and binding contract, the Agreement.

189. Capital One fulfilled its obligations under the Agreement.

190. Walmart breached █████████████████████████████████████
████████████████████████████████████████████████████████
██████████

191. Walmart breached ████████████████████████████████████
█████████████████████████████████████████████

192. Walmart breached ███████████████████████████████████
███████████████████████████ Walmart also breached █████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████

193. Walmart breached ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████ (emphasis added).

194. As a result of Walmart's breach of its marketing and promotional obligations under the Agreement, Capital One has sustained financial harm and has lost the expected benefits of the Agreement.

### THIRD CAUSE OF ACTION – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

195. The Agreement is governed by New York law.

196.  All contracts governed by New York law imply a covenant of good faith and fair dealing in the course of performance.  Pursuant to that implied covenant, neither party may do anything that will have the effect of destroying, injuring, or frustrating the right of the other party to receive the fruits of the contract.

197.  Dissatisfied with the financial terms of the Agreement, Walmart decided to take steps inconsistent with its obligation to act in good faith and engage in fair dealing.  Those steps included, but were not limited to, (i) efforts to reduce ███████████████████ ████████████████████████████████████ described above, and (ii) on information and belief, instructions by Walmart to its employees after this lawsuit was filed, to cease all promotion of the Card Program in its stores in ███████████████ ████████████████████████.

198.  Those actions were not merely independent breaches of Walmart's contractual obligations, as alleged above.  They were also intended, independently and collectively, to diminish the value of the Agreement's benefits to Capital One.  Additionally, while Capital One was expending substantial money and other resources on the Card Program, Walmart's actions were designed to substantially limit the money and other resources it was expending.

199.  These actions were undertaken by Walmart as part of its unsuccessful effort to renegotiate the terms of the Agreement.  Having failed in that effort, Walmart now puts forth a reading of Schedule 4.13 that is facially and structurally indefensible, in the hope that it can extricate itself from the Agreement entirely and deprive Capital One of the benefit of its bargain.

200. The foregoing conduct breached Walmart's implied covenant of good faith and fair dealing in the course of its performance of its obligations under the Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Capital One respectfully requests judgment and relief against Walmart as follows:

A. Issue a declaratory judgment finding that Walmart was not legally entitled to, and did not legally, terminate the Agreement, and that the Agreement is still in full force and effect;

B. Award Capital One all costs and fees incurred in defending against Walmart's First Amended Complaint and enforcing the terms of the Agreement;

C. Find that Walmart breached its marketing obligations under the Agreement;

D. Award Capital One money damages, in an amount to be proven at trial, sufficient to compensate it for all forms of loss incurred by reason of Walmart's breaches of the Agreement, including all reasonable costs and attorneys' fees; and

E. Grant Capital One such other and further relief as the Court deems just and proper.

# ANSWER

Defendant-Counterclaimant Capital One, National Association ("Capital One"), by its undersigned attorney, answers the First Amended Complaint of Plaintiffs-Counterclaim Defendants Walmart Inc., Wal-Mart Stores East, LP, Wal-Mart Louisiana, LLC, Wal-Mart Stores, Texas, LLC, Wal-Mart Stores Arkansas, LLC, Wal-Mart Puerto Rico, Inc.,Wal-Mart.com USA, LLC, and Walmart Apollo, LLC (together "Walmart") as follows:

## NATURE OF THE CASE

1.  In response to the allegations set forth in Paragraph 1, Capital One admits that Walmart and Capital One entered into a contract to issue Walmart-branded credit cards in the United States and admits that the parties agreed to certain service requirements that Capital One was obligated to meet. Capital One lacks sufficient information to either admit or deny that Walmart is the world's largest retailer, and denies all remaining allegations in paragraph 1.

2.  Capital One admits the allegations set forth in paragraph 2. In response to the allegations set forth in footnote 1, Capital One states that the Agreement speaks for itself, and respectfully refers the Court to the Agreement for its complete and accurate contents.

3.  Capital One admits the allegations set forth in paragraph 3.

4.  Capital One denies the allegations set forth in paragraph 4 except admits that the Agreement contains a list of SLAs, certain of which are designated as Critical SLAs, including one that requires 99.9% of replacement Credit Cards mailed within 5 business days (SLA 16). Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

5.  Capital One denies the allegations set forth in paragraph 5, except admits that between August 2022 and January 2023, Capital One self-reported five Critical SLA misses: three

failures of SLA 19 that occurred in June, July, and August 2022; one failure of SLA 14 that occurred in November 2022; and one failure of SLA 16 that occurred in August 2022. Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

6. In response to the allegations set forth in paragraph 6 of the Amended Complaint, Capital One states that the Agreement speaks for itself, and respectfully refers the Court to the Agreement for its complete and accurate contents.

7. Capital One denies the allegations set forth in paragraph 7.

8. The allegations set forth in paragraph 8 are legal conclusions to which no response is required. To the extent any response to the allegations set forth in paragraph 8 is required, Capital One denies them.

## THE PARTIES

9. The allegations set forth in paragraph 9 are legal conclusions to which no response is required. To the extent a response is required, Capital One admits the allegations set forth in paragraph 9.

10. The allegations set forth in paragraph 10 are legal conclusions to which no response is required. To the extent a response is required, Capital One lacks sufficient information to either admit or deny the allegations set forth in paragraph 10.

11. The allegations set forth in paragraph 11 are legal conclusions to which no response is required. To the extent a response is required, Capital One lacks sufficient information to either admit or deny the allegations set forth in paragraph 11.

12. The allegations set forth in paragraph 12 are legal conclusions to which no response is required. To the extent a response is required, Capital One lacks sufficient information to either admit or deny the allegations set forth in paragraph 12.

13. The allegations set forth in paragraph 13 are legal conclusions to which no response is required. To the extent a response is required, Capital One lacks sufficient information to either admit or deny the allegations set forth in paragraph 13.

14. The allegations set forth in paragraph 14 are legal conclusions to which no response is required. To the extent a response is required, Capital One admits the allegations set forth in paragraph 14.

15. The allegations set forth in paragraph 15 are legal conclusions to which no response is required. To the extent a response is required, Capital One lacks sufficient information to either admit or deny the allegations set forth in paragraph 15.

16. The allegations set forth in paragraph 16 are legal conclusions to which no response is required. To the extent a response is required, Capital One lacks sufficient information to either admit or deny the allegations set forth in paragraph 16.

17. The allegations set forth in paragraph 17 are legal conclusions to which no response is required. To the extent any response is required, Capital One admits it is a national bank with its main office in McLean, Virginia and is a citizen of Virginia.

**JURISDICTION AND VENUE**

18. The allegations set forth in paragraph 18 are legal conclusions to which no response is required. To the extent a response is required, Capital One admits that this Court has subject matter jurisdiction over this action.

19. The allegations set forth in paragraph 19 are legal conclusions to which no response is required. To the extent a response is required, Capital One admits that this Court has personal jurisdiction over Capital One.

20. The allegations set forth in paragraph 20 are legal conclusions to which no response is required. To the extent a response is required, Capital One admits that it has agreed to submit to the personal jurisdiction of this Court, and respectfully refers the Court to the Agreement for its complete and accurate contents.

21. The allegations set forth in paragraph 21 are legal conclusions to which no response is required. To the extent a response is required, Capital One admits that venue is proper in this Court.

**FACTUAL ALLEGATIONS**

A. Capital One's Failure to Meet The Parties' Bargained-For Customer Service Standards

22. Capital One admits the allegations in paragraph 22.

23. Capital One denies the allegations set forth in paragraph 23 except admits that the Agreement contains a list of SLAs—essentially, customer service benchmarks—in Schedule 4.13. Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

24. In response to the allegations set forth in paragraph 24 of the Amended Complaint, Capital One states that the Agreement speaks for itself, and respectfully refers the Court to the Agreement for its complete and accurate contents.

25. Capital One denies the allegations in paragraph 25 except admits that the Agreement contains SLAs, that each SLA is designated as "Critical" or "Non-Critical," and that pursuant to the Agreement, SLAs 14, 16, and 19 are designated as Critical SLAs. To the extent the allegations purport to reflect the contents of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

26. In response to the allegations set forth in paragraph 26 of the Amended Complaint, Capital One states that the Agreement speaks for itself, and respectfully refers the Court to the Agreement for its complete and accurate contents.

27. In response to the allegations set forth in paragraph 27 of the Amended Complaint, Capital One states that the Agreement speaks for itself, and respectfully refers the Court to the Agreement for its complete and accurate contents.

28. Capital One denies the allegations set forth in paragraph 28, except admits that in 2022, Capital One self-reported two failures of SLA 19 and one failure each of SLA 14 and SLA 16:

      a. Capital One admits that on August 16, 2022, Capital One self-reported that it failed to meet SLA 19 in July 2022 by (i) posting 55.24% of conforming payments within one business day of receipt (as opposed to the SLA requirement of 97%), and (ii) posting 76.4% of non-conforming payments within five business days of receipt (as opposed to the SLA requirement of 99%) because, as a result of a cyber incident impacting one of Capital One's payment processing vendors used to process direct mail credit card payments, Capital One ceased integrations with the vendor and routed customer-mailed payments to another vendor via overnight delivery, which resulted in delayed posting.

b. Capital One admits that on September 16, 2022, Capital One self-reported that it failed to meet SLA 16 in August 2022 by mailing 98.01% of replacement credit cards within five business days (as opposed to the SLA requirement of 99.9%) as a result of a COVID-related staffing shortage at Capital One's replacement card vendor. Capital One worked with its vendor to resolve the COVID-19 related staffing problem and by the next month 100% of replacement cards were mailed within five business days.

c. Capital One admits that on September 16, 2022, Capital One self-reported that it failed to meet SLA 19 in August 2022 by (i) posting 86.4% of conforming payments within one business day of receipt (as opposed to the SLA requirement of 97%), and (ii) posting 87.89% of non-conforming payments within five business days of receipt (as opposed to the SLA requirement of 99%) as a result of the same cyber incident involving a vendor that affected the August reporting metrics and described above.

d. Capital One admits that on December 15, 2022, Capital One self-reported that it failed to meet SLA 14 in November 2022 by posting 99.83% of transactions by the close of the following posting day (as opposed to the SLA requirement of 99.9%) due to a one-time coding error caused 47,000 transaction postings to be delayed. Capital One notified Walmart that a fix was made on November 2, 2022 to correct the error. Transactions were processed as expected for the remainder of the month, and there was no harm as result of the delayed transaction posting.

29. Capital One denies the allegations set forth in paragraph 29, except admits that on January 11, 2023, Capital One self-reported that, based on its own additional research, it had determined it had failed to meet SLA 19, which requires 97% of conforming payments be posted within 1 business day of receipt and 99% of non-conforming payments be processed and posted within 5 business days of receipt, in June 2022. The root cause of the June failure was the same as the root cause for the July and August failures of SLA 19, a cyber incident at a vendor beyond Capital One's reasonable control. After being notified of the cyber incident, Capital One ceased integrations with the vendor and routed customer-mailed payments to another vendor via overnight delivery, which resulted in 89.87% of conforming payments posting within one business day and 92.13% of non-conforming payments posting within five business days in June 2022. To the extent the allegations purport to reflect the contents

of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

30. Capital One denies the allegations set forth in paragraph 30, except admits that Capital One self-reported five disparate SLA misses—three of one SLA and two single violations of different SLAs—in a rolling 12 calendar month period, and admits that it informed Walmart and PwC that "[f]or Critical SLAs in 2022, Capital One missed the Payment Processing SLA three times and the Card Issuance and Transaction Posting SLAs once each."

31. Capital One denies the allegations set forth in paragraph 31, except admits that between August 2022 and January 2023, Capital One self-reported five critical SLA misses to Walmart: three misses of SLA 19 that occurred in June, July, and August 2022; one miss each of SLA 14 that occurred in November 2022; and one miss of SLA 16 that occurred in August 2022; admits that Walmart's purported termination right is based on misinterpretation of Section 4.13 and Schedule 4.13 of the Agreement, which permits termination only if Capital One "fails to meet a Critical SLA, five or more times in a rolling 12 calendar month period"; and admits that on April 2, 2023 (and at other points during the parties' discussions), Capital One informed Walmart that no termination right had been triggered pursuant to the Agreement.

32. Capital One admits the allegations set forth in paragraph 32.

B.      Capital One's Failure To Comply With The Contract's Post-Termination Provisions

33. Capital One denies the allegations set forth in paragraph 33, and to the extent the allegations purport to reflect the contents of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

34. In response to the allegations set forth in paragraph 34, Capital One states that the Agreement speaks for itself, and respectfully refers the Court to the Agreement for its complete and accurate contents.

35. In response to the allegations set forth in paragraph 35, Capital One states that the Agreement speaks for itself, and respectfully refers the Court to the Agreement for its complete and accurate contents. Capital One admits that Walmart sent an invalid evaluation notice on April 6, 2023.

36. Capital One denies the allegations set forth in paragraph 36 and to the extent the allegations purport to reflect the contents of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

37. Capital One denies the allegations set forth in paragraph 37 and to the extent the allegations purport to reflect the contents of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

38. Capital One denies the allegations set forth in paragraph 38 and to the extent the allegations purport to reflect the contents of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

39. Capital One denies the allegations set forth in paragraph 39, and to the extent the allegations purport to reflect the contents of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents, and admits that it informed Walmart in writing on April 27, 2023 that Walmart does not have a right to terminate under the Agreement and ████████████████████████

40. Capital One denies the allegations set forth in paragraph 40.

41. Capital One denies the allegations set forth in paragraph 41 and to the extent the allegations purport to reflect the contents of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

42. Capital One denies the allegations set forth in paragraph 42 and to the extent the allegations purport to reflect the contents of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

43. Capital One admits the allegations set forth in paragraph 43.

44. Capital One denies the allegations set forth in paragraph 44, except admits that on April 27, 2023, it informed Walmart that Walmart's purported termination of the Agreement and ███████████████████

45. Capital One denies the allegations set forth in paragraph 45.

## FIRST CAUSE OF ACTION
### (DECLARATORY JUDGMENT)

46. Capital One repeats all of its preceding answers as if fully set forth herein.

47. The allegations set forth in paragraph 47 are legal conclusions to which no response is required. To the extent any response to the allegations set forth in paragraph 47 is required, Capital One admits them.

48. The allegations set forth in paragraph 48 are legal conclusions to which no response is required. To the extent any response is required, Capital One admits them.

49. The allegations set forth in paragraph 49 are legal conclusions to which no response is required. To the extent any response is required, Capital One admits them.

50. In response to the allegations set forth in Paragraph 50 of the Amended Complaint, Capital One states that the Agreement speaks for itself, and respectfully refers the Court to the Agreement for its complete and accurate contents

51. Capital One denies the allegations set forth in paragraph 51, except admits that between August 2022 and January 2023, Capital One self-reported five critical SLA misses to Walmart: three misses of SLA 19 that occurred in June, July, and August 2022; one miss each of SLA 14 that occurred in November 2022; and one miss of SLA 16 that occurred in August 2022.

52. Capital One admits the allegations set forth in paragraph 52.

53. Capital One denies the allegations set forth in paragraph 53, except admits that on April 6, 2023 Walmart sent Capital One an invalid termination notice based on a misinterpretation of Section 4.13 and Schedule 4.13 of the Agreement.

54. The allegations set forth in paragraph 54 are legal conclusions to which no response is required. To the extent any response is required, Capital One denies that Walmart is entitled to a declaration that it was legally entitled to and legally did terminate the Agreement.

### SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT)

55. Capital One repeats all of its preceding answers as if fully set forth herein.

56. The allegations set forth in paragraph 56 are legal conclusions to which no response is required. To the extent any response is required, Capital One admits them.

57. Capital One denies the allegations set forth in paragraph 57.

58. Capital One denies the allegations set forth in paragraph 58 and to the extent the allegations purport to reflect the contents of the Agreement, Capital One respectfully refers the Court to the Agreement for its complete and accurate contents.

59. Capital One denies the allegations set forth in paragraph 59 except admits that Walmart sent Capital One an ███████████████ on April 6, 2023.

60. Capital One denies the allegations set forth in paragraph 60 except admits that on April 27, 2023, it informed Walmart that Walmart's purported termination of the Agreement and ██████████████████

61. Capital One denies the allegations set forth in paragraph 61.

62. Capital One denies the allegations set forth in paragraph 62.

### THIRD CAUSE OF ACTION
### (ANTICIPATORY BREACH OF CONTRACT)

63. Capital One repeats all of its preceding answers as if fully set forth herein.

64. The allegations set forth in paragraph 64 legal conclusions to which no response is required. To the extent any response is required, Capital One admits them.

65. Capital One denies the allegations set forth in paragraph 65.

66. Capital One denies the allegations set forth in paragraph 66.

67. Capital One denies the allegations set forth in paragraph 67.

### GENERAL DENIAL

Except as expressly stated above, Capital One denies each and every allegation in the Amended Complaint.

### ANSWER TO DEMAND FOR RELIEF

Capital One denies that Walmart is entitled to the relief requested or to any other relief.

### AFFIRMATIVE DEFENSES

Capital One sets forth the below affirmative defenses. By setting forth these defenses, Capital One does not assume the burden of proving any fact, issue, or element of claim where such burden properly belongs to Walmart. Capital One does not in any way waive or limit any defenses that are or may be raised by its denials and averments. These defenses are pled in the alternative, to preserve the rights of Capital One to assert such defenses, and are without

prejudice to the ability of Capital One to raise other and further defenses. Capital One reserves the right to seek leave to assert additional affirmative defenses based upon further investigation and discovery.

### First Affirmative Defense

The First Amended Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Walmart's claims are barred, in whole or in part, by the doctrines of ratification, unclean hands, laches, waiver, and/or estoppel.

### Third Affirmative Defense

Walmart is not entitled to the relief sought because Walmart breached its own obligations under the Agreement.

### Fourth Affirmative Defense

Walmart's breach of contract and anticipatory breach of contract claims are barred by a lack of injury in fact and a lack of causation.

### Fifth Affirmative Defense

Walmart's claim for damages is barred because it has suffered no damages and, to the extent it has suffered any damages, such damages are speculative and uncertain.

### Sixth Affirmative Defense

Walmart's breach of contract and anticipatory breach claims are barred by failure to allege a breach of the Agreement by Capital One.

### Seventh Affirmative Defense

Walmart's breach of contract and anticipatory breach claims are barred on the ground of complete performance because Capital One performed all of its obligations under the Agreement.

## Eighth Affirmative Defense

Walmart's claims are barred because Capital One has complied in all material respects with its obligations under the Agreement.

Dated: May 4, 2023
New York, New York

DEBEVOISE & PLIMPTON LLP

By: */s/ Mark P. Goodman*
John Gleeson
Mark P. Goodman
Helen Cantwell
Susan Reagan Gittes
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
Tel. (212) 909-6000
jgleeson@debevoise.com
mpgoodman@debevoise.com
hcantwell@debevoise.com
srgittes@debevoise.com

*Counsel for Defendant and Counterclaim Plaintiff Capital One*