UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WALMART INC.; WAL-MART STORES EAST, LP;
WAL-MART LOUISIANA, LLC; WAL-MART STORES
TEXAS, LLC; WAL-MART STORES ARKANSAS, LLC;
WAL-MART PUERTO RICO, INC.; WAL-MART.COM
USA, LLC; and WALMART APOLLO, LLC,

Plaintiffs /
Counter Defendants,

-v.-

CAPITAL ONE, NATIONAL ASSOCIATION,

Defendant /
Counter Claimant.

23 Civ. 2942 (KPF)

**REDACTED
OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

In July 2018, Plaintiffs/Counter-Defendants Walmart, Inc.; Wal-Mart

Stores East, LP; Wal-Mart Louisiana, LLC; Wal-Mart Stores Texas, LLC; Wal-

Mart Stores Arkansas, LLC; Wal-Mart Puerto Rico, Inc.; Wal-Mart.com USA,

LLC; and Walmart Apollo, LLC (together, "Plaintiffs" or "Walmart") entered into

a contract (the "Agreement") with Defendant/Counter-Plaintiff Capital One,

National Association ("Defendant" or "Capital One"). Pursuant to the

Agreement, Capital One was to serve as the exclusive issuer of Walmart credit

cards in the United States (the "Card Program"). While the ▮▮▮▮▮▮▮▮▮

Agreement contemplated a ▮▮▮▮▮▮ partnership between the parties,

Walmart now seeks to terminate that partnership ▮▮▮▮▮▮ in.

One provision of the Agreement — Part III.5 of Schedule 4.13, also

referred to herein as the "Termination Right" — gives Walmart a unilateral right

to terminate the Agreement in the event Capital One repeatedly fails to meet

certain critical customer service benchmarks. The parties disagree, however, on the proper interpretation of the Termination Right — and, more specifically, whether certain customer service issues experienced by Capital One in the second half of 2022 triggered Walmart's right to terminate the Agreement pursuant to this provision. The parties bring diametrically opposed motions for partial summary judgment on their respective declaratory judgment claims, each asking this Court to affirm their particular interpretation of the Agreement.

As explained in detail below, the Court finds that the Agreement is unambiguous, and that its plain meaning accords with Walmart's interpretation. That is, the Agreement's terms clearly dictate that Capital One's repeated customer service failures entitled Walmart to invoke the Termination Right and terminate the parties' ongoing partnership. Accordingly, the Court grants Walmart's motion for partial summary judgment and denies Capital One's motion for partial summary judgment.

**BACKGROUND**[1]

**A.    Factual Background**

**1.    The Parties and the Card Program**

Plaintiff Walmart Inc. is the world's largest retailer. (AC ¶ 1). It is a Delaware corporation with its principal place of business in Bentonville,

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with their cross-motions for partial summary judgment. The Court primarily sources facts from Plaintiffs' Local Civil Rule ("LR") 56.1 Statement (Dkt. #86 (redacted), 87 (sealed) ("Pl. 56.1")) and Defendant's LR 56.1 Statement (Dkt. #96 (redacted), 97 (sealed) ("Def. 56.1")), as well as Plaintiffs' LR 56.1 Response to

Arkansas. (*Id.* ¶ 9).[2] Walmart brings this action alongside seven of its associated entities: (i) Plaintiff Wal-Mart Stores Arkansas, LLC, an entity organized under the laws of Arkansas and, based upon its membership, a citizen of both Delaware and Arkansas (*id.* ¶ 13);[3] (ii) Plaintiff Wal-Mart Puerto Rico, Inc., a Puerto Rico corporation with its principal place of business in Arkansas (*id.* ¶ 14); (iii) Plaintiffs Wal-Mart Stores East, LP, Wal-Mart Louisiana, LLC, Wal-Mart Stores Texas, LLC, and Walmart Apollo, LLC, each

---

Defendant's LR 56.1 Statement (Dkt. #107 (redacted), 109 (sealed) ("Pl. Counter 56.1")) and Defendant's LR 56.1 Response to Plaintiffs' LR 56.1 Statement (Dkt. #115 (redacted), 116 (sealed) ("Def. Counter 56.1")). The Court also references the Declaration of Michael A. Cook ("Cook Decl." (Dkt. #84 (redacted), 85 (sealed))), submitted in connection with Plaintiffs' motion, as well as certain of the exhibits attached thereto ("Cook Decl., Ex. []"), including a copy of the Credit Card Partnership Agreement (Cook Decl., Ex. 1 ("CCPA")).

Citations to a party's LR 56.1 Statement incorporate by reference the documents and testimony cited therein. Where a fact stated in a movant's LR 56.1 Statement is supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true. *See* LR 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For ease of reference, the Court refers to Plaintiffs' memorandum of law in support of their motion for partial summary judgment as "Pl. Br." (Dkt. #88 (redacted), 89 (sealed)); to Defendant's memorandum of law in support of its motion for partial summary judgment as "Def. Br." (Dkt. #92 (redacted), 93 (sealed)); to Plaintiffs' memorandum of law in opposition to Defendant's motion as "Pl. Opp." (Dkt. #106 (redacted), 108 (sealed)); and to Defendant's memorandum of law in opposition to Plaintiffs' motion as "Def. Opp." (Dkt. #111 (redacted), 112 (sealed)).

[2]  Pursuant to 28 U.S.C. § 1332(c), a corporation is "a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business[.]"

[3]  The citizenship of a limited partnership ("LP") or a limited liability company ("LLC") is determined by the citizenship of each of its members. *See, e.g., Bayerische Landesbank, N.Y. Branch* v. *Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012); *New Millennium Cap. Partners, III, LLC* v. *Juniper Grp. Inc.*, No. 10 Civ. 46 (PKC), 2010 WL 1257325, at *1 (S.D.N.Y. Mar. 26, 2010); *see generally Carden* v. *Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990).

an entity organized under the laws of Delaware and, based upon its membership, a citizen of both Delaware and Arkansas (*id.* ¶¶ 10-12, 16); and (iv) Plaintiff Wal-Mart.com USA, LLC, an entity organized under the laws of California but, based upon its membership, a citizen of both Delaware and Arkansas (*id.* ¶ 15).

Defendant Capital One is a national bank. (AC ¶ 17). Its main office, as set forth in its articles of association, is located in McLean, Virginia. (*Id.*). Pursuant to 28 U.S.C. § 1348, Capital One is a citizen of Virginia. (*Id.*). *See* 28 U.S.C. § 1348 ("All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located.").

On July 23, 2018, Walmart and Capital One entered into a contract, the Credit Card Partnership Agreement, pursuant to which Capital One was to serve as the exclusive issuer of Walmart credit cards in the United States. (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 2). The Agreement governed the formation, launch, and operation of the Card Program. (Def. 56.1 ¶ 3). Broadly speaking, the Card Program offered to qualified Walmart customers both (i) a co-branded card, the "Capital One Walmart Rewards Mastercard," and (ii) a private-label card exclusively for Walmart purchases, the "Walmart Rewards Card." (Pl. 56.1 ¶ 3). The Agreement contemplated a █-year partnership between the parties, beginning on the date of the Card Program's launch on ███████████. (Pl. Counter 56.1 ¶ 2; ██████ (defining "Acquisition Start Date"), ██████).

4

## 2. Schedule 4.13 of the Agreement

Schedule 4.13 of the Agreement sets forth certain standards of customer service pertaining to Capital One's administration of the Card Program, as well as the penalties associated with Capital One's failure to meet such standards. Specifically, Part II of Schedule 4.13 delineates twenty Service Level Agreements (the "SLAs"), independent customer service benchmarks that Capital One was obligated to meet throughout the duration of the Card Program. (Pl. Counter 56.1 ¶ 16; *see generally* CCPA, sched. 4.13, pt. II). The Agreement designates each of these SLAs as either "Critical" or "Non-Critical." (Def. 56.1 ¶ 17). Pursuant to the Agreement, Capital One was required to provide Walmart with monthly reports on its performance with respect to each of the twenty SLAs. (*Id.* ¶ 18). For convenience, the list of the SLAs is reproduced below in full:

Part II. SLAs

| | Cardholder Service | | | |
|---|---|---|---|---|
| | **Category** | **Service** | **Service Level Standard** | **Category** |
| 1. | Call Center | ██████ | ████████████████ | Non-Critical |
| 2. | Call Center | ██████ | ████████████████ | Critical |
| 3. | Call Center | ██████ | ████████████████ | Critical |

| | | | | |
|---|---|---|---|---|
| 4. | Program Website | ██████ | ████████████████ ████ | Critical |
| 5. | Cardholder Inquiry | ████████ | ███████████████ ███████████ ████████████ ████████████ | Non-Critical |
| 6. | Dispute Resolution | ███████ | █████████ ████████████ ███████████████ █████████ | Non-Critical |
| 7. | Dispute Resolution | ████████ | ███████████████ ██████████ | Non-Critical |
| 8. | Dispute Resolution | ███████ | ████████████ ███████████ ████████ | Non-Critical |
| 9. | Online Chat | █████ | ██████████████ ███████████ | Non-Critical |
| 10. | Online Chat | ██████ | ████████ | Non-Critical |
| 11. | Authorization | ████ | ███████████ █████████ ███████ | Critical |
| 12. | Authorization | ███████ | ██████████ ████████ | Critical |
| 13. | Authorization | ████████ | ██████████ █████████ ████████ | Critical |

| 14. | Transaction Posting | Timeliness of Posting | For transactions received on processing days, 99.9% will be posted by the close of the following posting day …. | Critical |
|---|---|---|---|---|
| 15. | New Card Issuance | ██████ | ████████████████ | Critical |
| 16. | Card Replacements | Replacement Time | 99.9% of replacement Credit Cards mailed within 5 Business Days | Critical |
| 17. | Statement Production | ████ | ████████████████ | Critical |
| 18. | Statement Production | ████ | ████████████████ | Critical |
| 19. | Payment Processing | Posting Time | • Conforming payments: 97% posted within 1 Business Day of receipt<br>• Non-conforming payments: 99% processed and posted within 5 Business Days of receipt<br>• Electronic conforming payments: 99.9% of electronic conforming payments posted next Business Day | Critical |
| 20. | Applications | ████ | ████████████████ | Critical |

(CCPA, sched. 4.13, pt. II (emphases in original)).

Part III of Schedule 4.13 (the "Penalty Regime") sets forth the penalties associated with Capital One's failure to meet the SLAs. ████████████████

████ recites the lowest-level penalty:

> Within seven Business Days after the end of any calendar month during which ████████████████
> ████████████████████████████████
> ████████████████████. Within 10 Business Days after the end of any calendar month during which ████████
> ████████████████████████

██████████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████ .

(███████████████████ (emphasis in original)).  Upon ████████████

████████████████████████████ the Penalty Regime obligates Capital

One to make monetary payments to Walmart.  For example, ████████

██████████████████████ :

> [i]f (i) ████████████████████████████
> ████████████████████████████
> ████████████████████████████
> ████████████████ , then [Capital One] shall pay ████████ to
> Walmart ██████████████████████ , or
> (ii) █████████████████████████████
> ██████████████████████████████
> ████████████ , then [Capital One] shall
> pay ██████████ to Walmart ████████████
> ████████████████ .

(███████ (emphasis in original)).  These monetary payments escalate for

subsequent consecutive failures of the same SLA.  (*See id.* at ████████ ).

The instant dispute centers around a single provision of the Agreement,

which provision appears at the end of the Penalty Regime.  This provision —

Part III.5 of Schedule 4.13, the Termination Right — entitles Walmart to

terminate the Agreement based upon a critical mass of SLA failures:

> <u>Termination Right</u>:  If [Capital One] fails to meet a
> Critical SLA, five or more times in a rolling 12 calendar
> month period (each such SLA failure, a "**Major Service
> Failure**"), Walmart may terminate the Agreement.

(CCPA, sched. 4.13, pt. III.5 (emphasis in original)).

### 3.     Capital One's SLA Failures

Three years after the launch of the Card Program, during the six-month period between August 2022 and January 2023, Capital One reported a series of SLA failures to Walmart.  To begin, on August 10, 2022, Capital One reported to Walmart that it had failed to meet SLA #19 ("Payment Processing – Posting Time") during the month of July 2022.  (Pl. 56.1 ¶ 9).  In particular, Capital One had only succeeded in posting (i) 55.24% of conforming payments within one business day of receipt (as opposed to the required 97%) and (ii) 76.4% of non-conforming payments within five business days of receipt (as opposed to the required 99%).  (*Id.*).  Importantly, SLA #19 was designated in the Agreement as a "Critical" SLA.  (*Id.* ¶ 7).

Then, on September 16, 2022, Capital One reported to Walmart that it had failed to meet SLA #16 ("Card Replacements – Replacement Time"), also a "Critical" SLA, in the month of August 2022.  (Pl. 56.1 ¶¶ 7, 10).  SLA #16 required Capital One to mail "99.9% of replacement Credit Cards … within (five) Business Days[.]"  (Def. 56.1 ¶¶ 26-27).  That month, Capital One had only succeeded in mailing 98.01% of replacement cards within five business days.  (*Id.* ¶ 28).  Capital One also reported to Walmart that it had (for the second month in a row) failed to meet SLA #19 ("Payment Processing – Posting Time") by posting only (i) 86.4% of conforming payments within one business day of receipt (as opposed to the required 97%) and (ii) 87.89% of non-conforming payments within five business days of receipt (as opposed to the required 99%).  (Pl. 56.1 ¶ 11).

September and October passed without further incident.  In November 2022, however, Capital One failed to meet SLA #14 ("Transaction Posting – Timeliness of Posting") — again, a "Critical" SLA (Pl. 56.1 ¶ 7) — which provision required Capital One to post 99.9% of transactions received on a processing day by the close of the following posting day (Def. 56.1 ¶¶ 30-31). That month, Capital One posted only 99.83% of transactions by the close of the following posting day.  (*Id.* ¶ 32).  Capital One thereafter notified Walmart of the failure on December 15, 2022.  (*Id.* ¶ 33).

Less than a month later, on January 11, 2023, Capital One reported to Walmart that it had also failed to meet SLA #19 ("Payment Processing – Posting Time") back in the month of June 2022.  (Def. 56.1 ¶ 38).  In June 2022, Capital One had only succeeded in posting (i) 89.87% of conforming payments within one business day of receipt (as opposed to the required 97%), and (ii) 92.13% of non-conforming payments within five business days of receipt (as opposed to the required 99%).  (*Id.*).  With the addition of the June 2022 SLA #19 failure, Capital One had missed a total of five "Critical" SLAs in 2022.  (Pl. 56.1 ¶¶ 7, 14).

### 4. Walmart Attempts to Terminate the Agreement

On February 2, 2023, Capital One reported to Walmart in writing that "[f]or Critical SLAs in 2022, Capital One missed the Payment Processing SLA [SLA #19] three times and the Card Issuance [SLA #16] and Transaction Posting [SLA #14] SLAs once each."  (Pl. 56.1 ¶ 14).  In Walmart's view, this constituted "fail[ure] to meet a Critical SLA, five or more times in a rolling 12

10

calendar month period" under the Termination Right, empowering Walmart to terminate the Agreement.  (Pl. Br. 2).  Capital One disagreed, believing that the Termination Right could only be invoked for its failure to meet *the same* Critical SLA five or more times in a twelve-month period.  (Def. Br. 3).  Following a brief period of negotiations between the parties, on April 6, 2023, Walmart formally invoked the Termination Right, based upon its interpretation of the provision, delivering a formal notice of termination to Capital One pursuant to Schedule 4.13.  (Def. Counter 56.1 ¶¶ 14-17).  Capital One, in turn, claimed that Walmart's early termination of the Agreement was invalid.  (*Id.*).

Importantly, in the event of early termination, the Agreement empowers Walmart ███████████████████████████████ █:



(███████████ (emphasis in original)).  If Walmart ███████████ ███████████████████████, the Agreement contemplates ███████ ████████████████████████████████████████████████ ███████████.  (Pl. Counter 56.1 ¶ 14).

Wishing to pursue its option ████████████████████████, on April 6, 2023, Walmart ████████████████████████████ ████████████████████ (Def. Counter 56.1 ¶ 20).  ██████████

███████████████████████████████████████████

███████████████:



(███████████ (emphases in original)).

Under the Agreement, Walmart's ██████████████████

████████████████████████████████████. For example, ███

████████████████████████████████████████████████

███████████████████████████████████████████:

(███████████ (emphases in original); Def. 56.1 ¶ 13). As of twenty-one

days after April 6, 2023 (*i.e.*, April 27, 2023), however, Capital One had yet ██

████████████████████████████████████. (Def. Counter 56.1 ¶¶ 22-

23). That day, Capital One informed Walmart that Walmart was not entitled to

████████████████████████ because ████████████████████████████

████████████████████████ had occurred. (*Id.* ¶ 24).

In accordance with its view that Walmart's exercise of the Termination Right was invalid, Capital One also refused to perform other post-termination obligations under the Agreement. (Def. Counter 56.1 ¶¶ 27-33). For instance, Capital One ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████. (████████████████; Def. Counter 56.1 ¶¶ 28, 33). Nor has Capital One "██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (███████████; Def. Counter 56.1 ¶¶ 29, 33). According to Capital One, "it does not intend to fulfill [its] post-termination [] obligations because Walmart's purported termination right is invalid and, therefore, no post-termination [] obligations have been triggered." (*Id.* ¶ 33).

## B.    Procedural Background

Walmart initiated the instant action by filing a complaint on April 7, 2023. (Dkt. #1). Walmart's initial complaint asserted a single declaratory judgment claim against Capital One, hoping to affirm Walmart's interpretation of the Termination Right. (*See generally id.*). On April 20, 2023, prior to the filing of any responsive pleading by Capital One, Walmart filed a letter requesting a pre-motion conference in anticipation of filing a motion for partial summary judgment. (Dkt. #33 (redacted version), 34 (sealed version)). Walmart argued that expedited summary judgment practice was appropriate in

this case because Walmart's complaint presented "a straightforward issue of contract interpretation without any key material facts in dispute." (*Id.* at 1).

Soon after, on April 25, 2023, Capital One filed a letter opposing Walmart's request. (Dkt. #43 (redacted version), 44 (sealed version)). Capital One claimed that "the false sense of urgency to resolve this dispute [was] entirely manufactured by [Walmart]." (*Id.* at 1). To aid in its determination of the propriety of expedited summary judgment motion practice on Walmart's declaratory judgment claim, the Court scheduled a pre-motion conference for May 3, 2023. (Dkt. #35).

On May 2, 2023, Walmart filed an amended complaint (the "Amended Complaint"). (Dkt. #48 (redacted version), 50 (sealed version)). That same day, Walmart filed a letter informing the Court that, although Walmart's termination of the Agreement had "triggered a detailed [post-termination] transition process with a series of negotiated deadlines," Capital One was refusing to comply with any of the Agreement's post-termination provisions. (Dkt. #47 (redacted version), 49 (sealed version) at 1). Walmart had therefore decided to amend its complaint to add breach of contract and anticipatory breach of contract claims against Capital One, in addition to the original declaratory judgment claim (now "Count One" of the Amended Complaint). (*Id.*). Further, Walmart argued that Capital One's "refusal to comply with its [post-termination] obligations … [c]ould cause both money damages and irreparable harm" to Walmart, underscoring the need for the Court's prompt resolution of this action. (*Id.* at 2).

To provide Capital One with adequate time to respond to Walmart's May 2, 2023 letter, the Court adjourned the pre-motion conference to May 16, 2023. (Dkt. #53). On May 8, 2023, Capital One filed a response to Walmart's letter. (Dkt. #62 (redacted version), 63 (sealed version)). Capital One's May 8, 2023 letter asserted that Walmart was attempting to "put the cart — whether Capital One must follow the termination process — before the horse — whether a valid termination right has been triggered." (*Id.* at 1). In Capital One's view, "no early termination right ha[d] been triggered," meaning Walmart's termination of the Agreement was invalid, and Capital One had no obligation to "proceed with the termination process." (*Id.* at 2-3).

Capital One also filed an Answer and Counterclaims to Walmart's Amended Complaint. (Dkt. #56 (redacted version), 57 (sealed version)). Specifically, Capital One brought three counterclaims against Walmart, one each for (i) a declaratory judgment affirming Capital One's interpretation of the Contract ("Counterclaim One"), (ii) breach of contract, and (iii) anticipatory breach of contract, mirroring the claims pressed by Walmart in the Amended Complaint. (*Id.* ¶¶ 46-67). The Court then adjourned the May 16, 2023 pre-motion conference yet again, this time to May 24, 2023, to give Walmart time to consider and file any pre-motion correspondence regarding Capital One's counterclaims before the conference. (Dkt. #60).

On May 10, 2023, Walmart filed a pre-motion letter addressing Capital One's counterclaims. (Dkt. #66 (redacted version), 67 (sealed version)). According to Walmart, Counterclaim One — a "mirror image of Walmart's claim

15

for declaratory judgment," *i.e.*, Count One — was ripe for resolution via the expedited summary judgment motion practice that Walmart had envisioned for its own declaratory judgment claim. (*Id.* at 1). Accordingly, Walmart's letter asked the Court to "bifurcate and place [Capital One's second and third counterclaims] on a separate litigation track" from Counterclaim One, staying discovery as to Capital One's second and third counterclaims until the Court had had a chance to rule on the parties' declaratory judgment claims. (*Id.* at 3). After such determination, with the Court's leave, Walmart would file a motion to dismiss Capital One's second and third counterclaims. (*Id.*).

That same day, May 10, 2023, Capital One filed a pre-motion letter requesting leave to file a partial summary judgment motion on its declaratory judgment claim, Counterclaim One. (Dkt. #69 (redacted version), 70 (sealed version)). According to Capital One, "both parties [believed] that th[e] threshold issue [of whether a valid termination right has been triggered] c[ould] be resolved based on the four corners of the Agreement." (*Id.* at 3). Capital One thus "propose[d] simultaneous motions for [partial] summary judgment on the legal question of whether a valid termination right has been triggered[.]" (*Id.*).

Then, on May 12, 2023, Capital One filed a response to Walmart's May 10, 2023 letter. (Dkt. #73 (redacted version), 74 (sealed version)). In this letter, Capital One expressed its disagreement with Walmart's proposal to hold all discovery in abeyance pending summary judgment motion practice. Capital One argued that, because Walmart's claims and Capital One's counterclaims "ar[o]se from the same Agreement and likely w[ould] involve overlapping

document discovery and depositions," bifurcation of the declaratory judgment claims and the breach of contract claims was unwarranted, and "discovery and motion practice for all claims and counterclaims [should] proceed simultaneously." (*Id.* at 3).

On May 24, 2023, the Court held the twice-rescheduled pre-motion conference, during which it aired out the many issues raised in the parties' pre-conference submissions. (*See* May 24, 2023 Minute Entry; *see also* Dkt. #78 (transcript of May 24, 2023 pre-motion conference)). On May 25, 2023, the Court issued an Order setting a schedule for briefing on the parties' respective cross-motions for partial summary judgment, stating that:

> [b]riefing shall be limited to the issue of whether Walmart's right to terminate the [Agreement] has been triggered based on the text of the Agreement. To be clear, the parties may argue that the relevant language in the Agreement is ambiguous, and that extrinsic evidence is necessary to resolve the parties' dispute, but they are directed not to submit any extrinsic evidence at this time. If the Court finds that the Agreement is indeed ambiguous, it will promptly order limited discovery and briefing on that issue.

(Dkt. #77 at 1-2).

In accordance with the schedule and guidelines set forth in the Court's May 25, 2023 Order, the parties filed their opening partial summary judgment motions concerning Walmart's Count One and Capital One's Counterclaim One on June 26, 2023. (*See generally* Dkt. #82-89 (Walmart motion papers, including Dkt. #84 (redacted Declaration of Michael A. Cook), 85 (sealed Declaration of Michael A. Cook), 86 (redacted LR 56.1 statement), 87 (sealed LR 56.1 statement), 88 (redacted memorandum of law), and 89 (sealed

memorandum of law)); 91-97 (Capital One motion papers, including Dkt. #92 (redacted memorandum of law), 93 (sealed memorandum of law), 94 (redacted Declaration of Mark P. Goodman), 95 (sealed Declaration of Mark P. Goodman), 96 (redacted LR 56.1 statement), and 97 (sealed LR 56.1 statement))). One month later, on July 26, 2023, the parties filed their respective opposition papers. (*See generally* Dkt. #106-109 (Walmart opposition papers, including Dkt. #106 (redacted memorandum of law), 108 (sealed memorandum of law), 107 (redacted LR 56.1 counter-statement), and 109 (sealed LR 56.1 counter-statement)); 111-116 (Capital One opposition papers, including Dkt. #111 (redacted memorandum of law), 112 (sealed memorandum of law), 113 (redacted Declaration of Mark P. Goodman), 114 (sealed Declaration of Mark P. Goodman), 115 (redacted LR 56.1 counter-statement), and 116 (sealed LR 56.1 counter-statement))).

## DISCUSSION

### A.     Applicable Law

#### 1.     Motions for Summary Judgment Under Rule 56

To succeed on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a), a litigant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).

---

[5]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment

A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). Further, in considering whether the movant has met its burden to "show that no genuine factual dispute exists," a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

In the context of a dispute concerning the proper interpretation of a contract, the circumstances in which a court may grant a motion for summary judgment are limited. Generally speaking, there are two situations wherein "no genuine dispute of fact" as to the meaning of a contract can exist: "[i] when the language [of the contract] is unambiguous, [or] [ii] when the language [of the contract] is ambiguous … but the [available] extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *Nycal Corp.* v. *Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998); *see also 3Com Corp.* v. *Banco do Brasil, S.A.*, 171 F.3d 739, 746-47 (2d Cir. 1999) ("[T]he court may resolve ambiguity in contract language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person

determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

could decide the contrary." (alterations adopted) (internal quotation marks omitted)).  In either circumstance, a grant of summary judgment on an issue of contract interpretation is appropriate.

### 2.     The Declaratory Judgment Act

The Declaratory Judgment Act provides, in relevant part:  "In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III."  *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 126 (2007) (quoting *Aetna Life Ins. Co.* v. *Haworth*, 300 U.S. 227, 240 (1937)).

The Supreme Court has "required that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *MedImmune, Inc.*, 549 U.S. at 127 (alterations adopted) (internal quotation marks omitted). In other words, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Id.* (quoting *Md. Cas. Co.* v. *Pac. Coal*

& *Oil Co.*, 312 U.S. 270, 273 (1941)).  In evaluating whether to hear declaratory judgment actions, courts in this Circuit often consider "[i] whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and [ii] whether a judgment would finalize the controversy and offer relief from uncertainty."  *Dow Jones & Co.* v. *Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) (citing *Broadview Chem. Corp.* v. *Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969)).

**B.    The Court Grants Walmart's Motion for Partial Summary Judgment and Denies Capital One's Motion for Partial Summary Judgment**

Both Count One and Counterclaim One, and thus the parties' respective cross-motions for partial summary judgment, turn on the Court's interpretation of the Termination Right.  For convenience, the Court reproduces the provision here:

> Termination Right:    If [Capital One] fails to meet a Critical SLA, five or more times in a rolling 12 calendar month period (each such SLA failure, a "**Major Service Failure**"), Walmart may terminate the Agreement.

(CCPA, sched. 4.13, pt. III.5 (emphasis in original)).

As previously noted, Walmart believes that it is entitled to invoke the Termination Right if Capital One fails to meet *any* Critical SLA five or more times in a rolling twelve-month period.  (Pl. Br. 2).  Capital One, on the other hand, believes the Termination Right may be invoked only if Capital One fails to meet *the same* Critical SLA five or more times in a rolling twelve-month period.  (Def. Br. 3).  In short, the parties dispute what the Termination Right means by "*a* Critical SLA."  For the reasons that follow, the Court finds that the

plain meaning of the Agreement accords with Walmart's interpretation of the
Termination Right. The Court thus grants Walmart's motion for partial
summary judgment as to Count One and denies Capital One's motion for
partial summary judgment as to Counterclaim One.

### 1. The Plain Meaning of "a Critical SLA" in the Termination Right Is "Any One of the Critical SLAs"

Under New York law,[6] "the objective of contract interpretation is to give
effect to the expressed intentions of the parties, [and] the best evidence of what
parties to a written agreement intend is what they say in their writing." *L.
Debenture Tr. Co. of N.Y.* v. *Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir.
2010) (alterations adopted) (internal quotation marks and citations omitted).
At the summary judgment stage, "the initial question for the court … is
whether the contract [as written] is unambiguous with respect to the question
disputed by the parties." *Id.* at 465 (internal quotation marks omitted). Where
a contract is unambiguous, courts apply the "plain meaning" of its terms as
written. *In re Celsius Network LLC*, 649 B.R. 87, 98 (Bankr. S.D.N.Y. 2023).

In determining whether the Agreement is ambiguous, the Court's
investigation is cabined by familiar and well-settled principles. Ambiguity
exists only where a contract is "capable of more than one meaning when viewed

---

[6]     Interpretation of the Agreement is governed by New York law in accordance with Section
        12.11. (*See* CCPA § 12.11 ("The Parties agree that this Agreement and any matter
        arising from or in connection with it will be governed by and construed in accordance
        with the internal laws of the State of New York, without regard to its conflict of law
        principles.")). Further, both parties apply New York law in support of their respective
        interpretations of the Agreement. (*See, e.g.*, Pl. Br. 10; Def. Br. 14). *See also Am. Fuel
        Corp.* v. *Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties
        have agreed to the application of the forum law, their consent concludes the choice of
        law inquiry.").

objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages[,] and terminology as generally understood in the particular trade or business." *Sayers* v. *Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks omitted); *see generally Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation[.]" *Maverick Tube Corp.*, 595 F.3d at 467 (internal quotation marks omitted); *see Thompson* v. *Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) ("The mere assertion of an ambiguity does not suffice to make an issue of fact."). And evidence outside the four corners of a contract should neither "be considered [in determining ambiguity]" nor used "to create an ambiguity" in an otherwise clear agreement. *W.W.W. Assocs., Inc.* v. *Giancontieri*, 77 N.Y.2d 157, 163 (1990); *see also Howard* v. *Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002) ("[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract[.]" (citations omitted)).

Here, the Court finds that the Agreement is capable of only one meaning "when viewed objectively by a reasonably intelligent person." *Sayers*, 7 F.3d at 1095. Pursuant to the plain and unambiguous terms of the Termination Right, Walmart is entitled to terminate the Agreement if Capital One fails to meet any one of the Critical SLAs at least five times in a twelve-month period. In other

23

words, "*a* Critical SLA" — as used in the Termination Right — clearly means "any one of the Critical SLAs," and not "the same Critical SLA."

In reaching this conclusion, the Court begins from the unremarkable premise that the article "a," when used prior to a countable noun, is most often understood to refer to a nonspecific thing. More tangibly, the phrase "a [countable noun]" is generally read as "any one of the [countable noun]s" (*e.g.*, "we are looking for *a condo* on Dodge Street") or "an unspecified [countable noun]" (*e.g.*, "I heard *a creature* in the garage"). *See, e.g.*, *Indefinite Article*, New Oxford English Dictionary (3d ed. 2010) (defining "indefinite article" as "a determiner (*a* and *an* in English) that introduces a noun phrase and implies that the thing referred to is nonspecific" (emphases in original)); *A*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/a [https://perma.cc/4YRS-KGPK] (last visited March 20, 2024) (defining "a" as a word "used … before singular nouns when the referent is unspecified"); Bryan A. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 61 (2016) ("An indefinite article [such as 'a'] points to a nonspecific object, thing, or person that is not distinguished from the other members of a class[,] [*e.g.*,] {a student at Princeton}[.]"). Thus, use of the word "a" before "Critical SLA" generally implies that "Critical SLA" is nonspecific.

Secondary sources specific to legal writing conceptualize "a" in a similar manner. *See, e.g.*, 73 Am. Jur. 2d *Statutes* § 142, Westlaw (February 2024 Update) ("Pursuant to customary usage, indefinite articles like 'a' or 'an' normally precede countable nouns, while, by contrast, noncountable nouns

almost never take indefinite articles."); 82 C.J.S. *Statutes* § 428 n.6, Westlaw (March 2024 Update) (same); 1A Jabez G. Sutherland, Statutes and Statutory Const. § 21:16 (7th ed.), Westlaw (November 2023 Update) ("The word 'the' is a definite article, and unlike 'a' or 'an,' that definite article suggests specificity."); Bryan A. Garner, The Redbook: A Manual on Legal Style § 11.39 at 229 (4th ed. 2018) ("Use the definite article *the* to signal a specific person, place, or thing; use the indefinite article *a* or *an* to signal a generic reference." (emphases in original)); Gerald Lebovits, *Do's, Don'ts, and Maybes: Legal Writing Grammar – Part II*, N.Y. State Bar J., January 2008, at 80 ("'A' and 'an' are indefinite articles that refer to someone or something general.").

The notion that "*a* Critical SLA" refers to a nonspecific Critical SLA is further supported by the case law. Indeed, the Second Circuit has counseled that "use of the indefinite article 'a' implies that the modified noun is but one of several of that kind." *Renz* v. *Grey Advert., Inc.*, 135 F.3d 217, 222 (2d Cir. 1997) (interpreting jury charge) (finding phrase "age was a motivating factor" would "suggest[] that age was one of the considerations motivating the [disputed] decision"); *see also United States* v. *Requena*, 980 F.3d 30, 50 n.17 (2d Cir. 2020) (interpreting statute) ("[W]e treat the language '*a* controlled substance in schedule I or II' to refer … to 'some unspecified substance listed on schedule I or II.'" (emphasis in original) (quoting 21 U.S.C. § 841(b)(1)(C))).

Federal courts in this Circuit and New York state courts have concluded in kind — and in a variety of different interpretive contexts. *See, e.g., Bitzarkis* v. *Evans*, 157 N.Y.S.3d 330, 333 (N.Y. Civ. Ct. 2021) (interpreting statute)

("[T]he use of the indefinite article 'a' in [the phrase 'the respondent has not experienced a hardship'] means 'one or more.'"); *Shim-Larkin* v. *City of New York*, No. 16 Civ. 6099 (AJN) (KNF), 2020 WL 5534928, at *17 (S.D.N.Y. Sept. 14, 2020) (interpreting interrogatory response) ("[U]sing the indefinite article 'a' in responding to Interrogatory No. 6 allowed the defendant to [] avoid referring to the specific, unique and particular [thing] described … in that interrogatory[.]"), *objections overruled*, No. 16 Civ. 6099 (AJN), 2022 WL 1250548 (S.D.N.Y. Apr. 27, 2022); *Janssen Pharmaceutica N.V.* v. *Eon Labs Mfg., Inc.*, No. 01 Civ. 2322 (NG) (MDG), 2003 WL 25819555, at *6 (E.D.N.Y. Nov. 25, 2003) (interpreting patent)[7] ("[T]he article 'a' receives a singular interpretation only in rare circumstances when the [drafter] evinces a clear intent to so limit the article." (internal quotation marks omitted)); *Cook* v. *Carmen S. Pariso, Inc.*, 734 N.Y.S.2d 753, 757-58 (4th Dep't 2001) (interpreting statute) (finding phrase "real property improved … with *a* single family dwelling" to encompass real property improved with "one or more" single-family dwellings (emphasis added)) ("[T]he article 'a' generally is not to be read in the singular sense unless such an intention is clearly conveyed by the language and structure of the statute."); *Scaringi* v. *Elizabeth Broome Realty Corp.*, 586

---

7    The Court acknowledges that the principle that the "'indefinite article 'a' or 'an' … carries the meaning of 'one or more'" is especially true in the realm of patent law. *Small* v. *Nobel Biocare USA, LLC*, No. 05 Civ. 3225 (RJH), 2011 WL 3586470, at *21 (S.D.N.Y. Aug. 11, 2011), *on reconsideration in part*, No. 05 Civ. 3225 (NRB), 2012 WL 952396 (S.D.N.Y. Mar. 21, 2012) (internal quotation marks omitted). In that realm, the principle is "best described as a rule." *Id.* (internal quotation marks omitted). Exceptions are "extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one'; specifically, where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule, an exception exists." *Id.* (internal quotation marks omitted).

N.Y.S.2d 472, 473 (N.Y. Sup. Ct. 1991) (interpreting statute) ("The word 'the' connotes the particular, distinctive and definite, and not a broad, imprecise, or generic type as embraced in the indefinite article 'a.'"), *aff'd*, 594 N.Y.S.2d 242 (1st Dep't 1993).

Here, nothing in the text of Termination Right indicates an intent to deviate from this default interpretation or provides the Court with a basis to find ambiguity. For one, in drafting the Agreement, the parties did not add any qualifiers to "Critical SLA" that would clearly indicate a specific reference (*e.g.*, "if Capital One fails to meet a *specific* Critical SLA" or "if Capital One fails to meet a *single* Critical SLA"). Further, the parties did not include phrases or clauses elsewhere in the Termination Right that would support the inference that "a Critical SLA" refers to the same Critical SLA (*e.g.*, "if Capital One fails to meet a Critical SLA, five or more times in a rolling 12 calendar month period, *so long as the SLA failure is of the same type*"). The Court thus finds that the "plain and ordinary meaning" of the phrase "a Critical SLA," as it is used in the Termination Right, is "any one of the Critical SLAs." *Herrnsdorf* v. *Bernard Janowitz Const. Corp.*, 947 N.Y.S.2d 552, 554 (2d Dep't 2012).

Capital One raises several arguments to the contrary, none of which is persuasive. First, Capital One argues that "[t]he word 'a' is singular, and by modifying 'Critical SLA' it means a specific one." (Def. Br. 12). This argument "strain[s] the contract language beyond its reasonable and ordinary meaning." *In re Coudert Bros.*, 487 B.R. 375, 391 (S.D.N.Y. 2013) (internal quotation marks omitted). The word "a" is an article — *i.e.*, a word that characterizes or

limits a noun[8] — and therefore has neither a singular nor a plural form.  That is, "a" is always used before a singular noun, whether or not that noun refers to a specific item (*e.g.*, "I saw *a movie* called *Jaws* last night") or a nonspecific item within a class of items (*e.g.*, "she would like *a* drink").  Use of the word "a" alone thus does not indicate whether "a Critical SLA" is a specific or nonspecific reference; as Capital One concedes, "'a' has no fixed meaning and necessarily depends on the context of the surrounding words."  (Def. Opp. 8).

Capital One next highlights cases in which courts have found that the words "a" or "an" in a contract or statute provided a specific reference to a particular thing.  (Def. Br. 12).  Those cases, however, are plainly distinguishable.  In many of those cases, other operative phrases in the disputed provision made it clear that the contested "a" or "an" provided a specific reference.  *See, e.g.*, *Ergowerx Intern., LLC* v. *Maxell Corp. of America*, 18 F. Supp. 3d 430, 441 (S.D.N.Y. 2014).  In *Ergowerx*, for instance, the Court found that the phrase "an eighteen (18) month period" in the sentence

> Maxell will use good faith efforts to purchase [items] from Vendor … during *an eighteen (18) month period* beginning on the execution date [of the parties' agreement]

referred to "a single, distinct [eighteen-month] period."  *Id.* at 440-41 (emphasis added).  Of course, in *Ergowerx,* "an eighteen (18) month period" was limited by the operative phrase "beginning on the execution date [of the parties'

---

8      *Article*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/article [https://perma.cc/9V3M-CUHL] (last visited March 21, 2024) (defining "article" as "any of a small set of words or affixes (such as *a*, *an*, and *the*) used with nouns to limit or give definiteness to the application" (emphases in original)).

agreement]"; the reference to "an eighteen (18) month period" thus could not have been to just any eighteen-month period. *See id.* The Termination Right is entirely devoid of any analogous indication.

Capital One's remaining "plain meaning" arguments center around the adverbial phrase "five or more times." (Def. Br. 12-15). Specifically, Capital One argues that "the use of 'a,' in combination with the phrase 'five or more times,' conveys that *the same* Critical SLA must be missed in order for [the] [T]ermination [R]ight to be triggered." (Def. Br. 12 (emphasis added)). Capital One further contends that "[t]he comma dividing 'a Critical SLA' and 'five or more times'" at the beginning of the Termination Right — *i.e.*,

> If [Capital One] fails to meet a Critical SLA, five or more times in a rolling 12 calendar month period…

(CCPA, sched. 4.13, pt. III.5) — supports this interpretation (Def. Br. 13). According to Capital One, this lone comma demonstrates that the phrase "five or more times" both "[i] modifies 'a Critical SLA' [and] [ii] [indicates] that the provision refers to repeated misses of a singular critical SLA — *a* Critical SLA miss, repeated five times." (*Id.* at 13 (emphasis in original)).

The Court, however, does not read the phrase "five or more times" or its accompanying punctuation — namely, the comma between "a Critical SLA" and "five or more times" — as favoring one party's interpretation over the other's. Stepping back for a brief grammatical tangent, the Court observes that the phrase "five or more times" is an adverbial phrase. An adverb is a word that "describe[s] how, when, or what took place at any given moment" (*e.g.*, "loudly,"

29

"badly," "incredibly," and "sometimes"). *What Is An Adverbial Phrase?*, Oxford International English Schools, https://www.oxfordinternationalenglish.com/ what-is-an-adverbial-phrase/ [https://perma.cc/AMT2-YC5U] (last visited March 21, 2024). An adverbial phrase, on the other hand, "provides the same function that [a] single adverb does (giving us some more context regarding the time, place, or manner of [an] event)," but with a series of words instead — for example, "Nick will visit *in the morning*." *Id.*

The purpose of the adverbial phrase at issue here, "five or more times," is to provide context regarding the number of times the event "[Capital One] fails to meet a Critical SLA" must occur. Contrary to Capital One's assertions, the purpose of the phrase is not to modify "a Critical SLA" or to indicate that "a Critical SLA" is a specific reference. An adverbial phrase like "five or more times" simply cannot modify "a Critical SLA" alone or in the first instance, regardless of whether a comma comes before it. Stated differently, one could directly modify "a Critical SLA" with an adjective (*e.g.*, "*yellow* Critical SLA" or "*special* Critical SLA") but not with an adverb or adverbial phrase (*e.g.*, "*loudly* Critical SLA," or, as here, "*five or more times* Critical SLA"). This is not a "convoluted grammatical argument[] … disconnected from the plain language of the Agreement" (Def. Opp. 8), but rather a reality of the English language. For this reason, the Court cannot agree that the adverbial phrase "five or more times," or the comma that precedes it, speaks directly to whatever is meant by "a Critical SLA."

Finding Capital One's arguments unpersuasive, the Court returns to its conclusion that the Agreement is unambiguous and the plain meaning of the Termination Right is clear: the phrase "a Critical SLA" means "any one of the Critical SLAs." Because the Court "finds that the terms [of the Agreement are unambiguous … it [may] properly grant summary judgment" in favor of Walmart. *Alexander & Alexander Servs., Inc.* v. *These Certain Underwriters at Lloyd's, London, Eng.*, 136 F.3d 82, 86 (2d Cir. 1998).

### 2. The Termination Right's Surrounding Context Supports Walmart's Interpretation

Moving beyond the text of the Termination Right itself, the Court finds further support for Walmart's interpretation. A court faced with an issue of contractual interpretation is obligated to read the contract "as a whole[,] to give effect and meaning to every term." *N.Y. State Thruway Auth.* v. *KTA-Tator Eng'g Servs., P.C.*, 913 N.Y.S.2d 438, 440 (4th Dep't 2010). "Indeed, a contract should be interpreted in a way that reconciles all of its provisions, if possible." *Id.* (internal quotation marks omitted). Each provision of the contract "should be considered, not as if isolated from [its] context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Holland Loader Co., LLC* v. *FLSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018) (quoting *MBIA Ins. Corp.* v. *Patriarch Partners VII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012)), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (summary order).

Here, the provisions surrounding the Termination Right support the notion that the reference to "a Critical SLA" in the Termination Right is

nonspecific.  First, throughout Schedule 4.13, the drafters repeatedly use "a" or "an" to refer to a nonspecific SLA.  As a reminder, the Termination Right constitutes Part III.5 of Schedule 4.13.  (*See* CCPA, sched. 4.13, pt. III.5). ▮

▮:



(▮ (emphasis added)).  In this provision, ▮ ▮.  ▮ ▮.  (*See, e.g.,* *id.* at ▮ ▮).  In other words, the drafters' use of "a" or "an" to refer to a nonspecific SLA is commonplace.

More pointedly, however, ▮ ▮ ▮.  Specifically, ▮

(▮ (emphasis added)).  Similarly, ▮:



( █████ (emphases added)).

█████████████ thus make clear that the Agreement's drafters knew how to refer to a specific SLA. The fact that the drafters chose not to include the descriptor "the same" in the Termination Right (*i.e.*, "[i]f [Capital One] fails to meet *the same* Critical SLA, five or more times in a rolling 12 calendar month period") — ████████████████████████████ ███████ — is most naturally understood as a deliberate effort to avoid imposing such a limitation on the Termination Right. *See Bank of New York Mellon Tr. Co., Nat. Ass'n* v. *Morgan Stanley Mortg. Cap., Inc.*, No. 11 Civ. 0505 (CM), 2013 WL 3146824, at *20 (S.D.N.Y. June 19, 2013) (noting that "context provided by the surrounding provisions" underscored proper interpretation of a contract provision).

Capital One counters with the observation that "where the Agreement means 'any' SLA, it explicitly says so." (Def. Opp. 13 (citing ████████ ████████████████████████████ ████████████████████████████ ████████████████████████ )). Accordingly, Capital One argues, the drafters could just have easily included the descriptor "any" in the Termination Right (*i.e.*, "[i]f [Capital One] fails to meet *any* Critical

SLA, five or more times") as opposed to the descriptor "the same" (*i.e.*, "[i]f [Capital One] fails to meet *the same* Critical SLA, five or more times").

While at first glance, this argument appears compelling, it loses steam upon closer examination. Critically, where Schedule 4.13 otherwise means "the same" SLA, it *always* says so; where Schedule 4.13 means "any" SLA, it *does not always* say so. (*See generally* CCPA, sched. 4.13). What is more, as explained in detail above, the article "a" used prior to a countable noun is most often understood to refer to a nonspecific thing; *i.e.*, the default interpretation is that the countable noun is but one of several of that kind. In other words, the default interpretation of "a Critical SLA" is "any of the Critical SLAs." Thus, the drafter's omission of "any" from the Termination Right does not bear the same weight as the drafter's omission of "the same" from the Termination Right.

### 3. Walmart's Interpretation of the Termination Right Presents No "Absurdity"

While the preceding discussion serves to resolve this dispute in full, both parties' briefing devotes significant space to an as-yet-unexamined principle of contract interpretation that the Court believes merits addressing herein. To support their respective interpretations of the Termination Right, both parties invoke the principle that "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable[,] or contrary to the reasonable expectations of the parties." *McFarlane* v. *Altice USA, Inc.*, 524 F. Supp. 3d 264, 277 (S.D.N.Y. 2021) (internal quotation marks omitted). Stated differently, this principle cautions against interpreting a contract such that "no

reasonable person" would believe the chosen interpretation reflects the contract's intended meaning. *Id.*

For its part, Capital One argues that Walmart's interpretation of the Termination Right violates this principle for two related reasons. *First,* according to Capital One, Walmart's interpretation is "obviously incompatible" with the "carefully calibrated" Penalty Regime. (Def. Br. 16). As a reminder, the Penalty Regime, found in Part III of Schedule 4.13, sets forth the penalties associated with Capital One's failure to comply with the SLAs. (*See generally* CCPA, sched. 4.13, pt. III ("████████████████████")). According to Capital One, the Penalty Regime "provides the parties with flexibility to impose increasing penalties where the severity of [Capital One's] [performance] failure demands it, setting forth a schedule of higher monetary penalties based on the degree of the miss." (Def. Opp. 16). To allow Walmart to invoke the Termination Right where, for instance, "five inconsequential Critical SLA misses occurred and were immediately and permanently cured in a single week" (Def. Br. 16), would, in Capital One's view, "circumvent the [Penalty Regime's] structure[,] [which] contemplates early termination only as a final remedy available after written action plans are made, opportunities to cure have failed, and escalating monetary penalties have failed" (Def. Opp. 22).

*Second*, Capital One asserts that Walmart's interpretation of the Termination Right does not comport with the notion that, under the Agreement, "████████████████████████████." (Def. Br. 18). According to Capital One, the parties intentionally "██████████████

██████████████████████████████████████████████████

████████████████████████████████████████████" (*Id.*).

To allow Walmart to invoke the Termination Right where, again by way of

example, "five inconsequential Critical SLA misses occurred and were

immediately and permanently cured in a single week" (*id.* at 16), would

represent "████████████████████████████████████████████

which "████████████████████████████████████████████

████████████████████" (*e.g.,* ███████████████████) (*id.* at 19).  The Court

considers, and rejects, each argument in turn.

As an initial matter, the Court does not find the "carefully calibrated"

Penalty Regime set forth in Part III of Schedule 4.13 to be "obviously

incompatible" with Walmart's interpretation of the Termination Right (*see* Def.

Br. 16).  It is not "unreasonable" to believe that the parties understood five

Critical SLA misses in a one-year period — even in the most extreme of

situations, wherein the five Critical SLA misses "occurred and were

immediately and permanently cured in a single week" — to be such a

significant deficiency in Capital One's performance that the Penalty Regime's

graduated penalties were insufficient to address it.  (*Id.*).  The Termination

Right (as Walmart and the Court read it) thus serves as a back-stop within the

broader Penalty Regime to address those performance failures that are so

significant that "written action plans," "opportunities to cure," and "escalating

monetary penalties" (Def. Opp. 22), are simply not commensurate

consequences.

Conversely, the Court has no basis upon which to conclude that any five Critical SLA misses in a twelve-month period is such an insignificant occurrence that it is obvious that the parties would never have premised an early termination right upon it. In fact, the Court has good reason to conclude the opposite: the parties labeled a particular subset of the SLAs "Critical," rendering such SLAs by definition "very important or significant; crucial." *See Critical*, NEW OXFORD ENGLISH DICTIONARY (3d ed. 2010). (*See also* Pl. Opp. 19 ("Capital One complains that Walmart's reading permits termination of the Contract upon five '*inconsequential Critical* SLA misses[.]' ... Capital One's juxtaposition of the words 'inconsequential' ... and 'Critical' ... speaks volumes[.]" (emphasis added) (citations omitted))). The Court will not substitute its own judgment as to the importance *vel non* of the Critical SLAs for that of the contracting parties, particularly when the text of the Agreement expressly counsels that such SLAs are "very important or significant." *See also United States* v. *Barrow*, 400 F.3d 109, 117-18 (2d Cir. 2005) ("[T]he parties' intent is discerned from the four corners of their agreement." (internal quotation marks omitted)).

In point of fact, Capital One's interpretation of the Termination Right could very well engender a "result that is ... contrary to the reasonable expectations of the parties." *McFarlane*, 524 F. Supp. 3d at 277 (internal quotation marks omitted). As Walmart explains, Capital One's interpretation suggests that Capital One "may fail to perform on more than fifty Critical SLAs in any twelve-month period — and may fail to meet each and every Critical SLA

four times every year for ten years — and Walmart would [still] be powerless to terminate the agreement." (Pl. Br. 16).

For example, under Capital One's reading, [Capital One] could fail to meet Critical SLAs, as illustrated in the following chart, and still Walmart would have no right to terminate:

| | Critical SLA | Month (X = Capital One Failure) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 2. | Call answer time | X | | X | | X | | X | | | | | |
| 3. | Call blockage | | X | | X | | X | | X | | | | |
| 4. | Program website | | | X | | X | | X | | X | | | |
| 11. | Authorization system | | | | X | | X | | X | | X | | |
| 12. | Authorization rate | | | | | X | | X | | X | | X | |
| 13. | Authorization time | | | | | | X | | X | | X | | X |
| 14. | Transaction posting | X | | X | | X | | X | | | | | |
| 15. | New card issuance | | X | | X | | X | | X | | | | |
| 16. | Replacement cards | | | X | | X | | X | | X | | | |
| 17. | Mailed statements | | | | X | | X | | X | | X | | |
| 18. | Online statements | | | | | X | | X | | X | | X | |
| 19. | Payment posting | | | | | | X | | X | | X | | X |
| 20. | Application decisions | X | | X | | X | | X | | | | | |

> In this hypothetical example, Capital One has failed
> Critical SLAs 52 times in twelve months, including 20
> failures in just Months 5 through 7, and still Walmart —
> under Capital One's reading — cannot terminate what
> would be an unquestionably disastrous,
> nonfunctioning Program.

(*Id.* at 16-17).

Capital One characterizes this as an "outlandish hypothetical." (Def.

Opp. 16). Further, Capital One argues that, under its interpretation, the

Penalty Regime still "provides [Walmart] ample protection[,] even if the[]

[hypothetical] were to come to pass." (*Id.*). Specifically, in this scenario,

pursuant to the Penalty Regime's schedule of monetary penalties, Capital One

would owe Walmart ███████ in penalty payments per year. (*Id.*). But in the

context of a "████████████████████," the magnitude of which Capital

One has repeatedly stressed (*see, e.g., id.* at 5, 18, 23), these penalty payments

are hardly commensurate with Walmart's ability to unilaterally terminate an

"unquestionably disastrous, nonfunctioning [Card] Program" (Pl. Br. 17). The

point is that — setting aside the remoteness of Walmart's 52-miss

hypothetical — there are situations in which the utility and non-

substitutability of the Termination Right (as Walmart understands it), over and

above the Penalty Regime's other consequences, is apparent.

Putting to the side both parties' extreme hypotheticals, the Court returns

to the ineluctable fact that the Termination Right is the very remedy for which

the parties bargained. Ultimately, "[a] written agreement that is clear, complete

and subject to only one reasonable interpretation must be enforced according

to the plain meaning of the language chosen by the contracting parties."

*Acumen Re Mgmt. Corp.* v. *Gen. Sec. Nat'l Ins. Co.*, No. 09 Civ. 1796 (GBD),

2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012) (internal quotation marks

omitted).  More broadly, "freedom of contract prevails in an arm's length

transaction between sophisticated parties[,] and in the absence of

countervailing public policy concerns there is no reason to relieve them of the

consequences of their bargain."  *159 MP Corp.* v. *Redbridge Bedford, LLC*, 33

N.Y.3d 353, 359 (2019) (internal quotation marks omitted).  The Court declines

to relieve Capital One of the consequences of its bargain here.

## CONCLUSION

For the foregoing reasons, Walmart's motion for partial summary

judgment as to Count One of Walmart's Amended Complaint and Count One of

the Counterclaims is hereby GRANTED, and Capital One's motion for partial

summary judgment as to Counterclaim One and Count One of Walmart's

Amended Complaint is hereby DENIED.  The Court declares, pursuant to 28

U.S.C. § 2201, that Walmart was legally entitled to, and legally did, terminate

the Agreement.

The Court will issue this Opinion in two versions.  The Clerk of Court is

directed to file the sealed version of this Opinion under seal, viewable to the

Court and the parties only, and to file the redacted version of this Opinion on

the public docket.  The Clerk of Court is also directed to terminate the motions

pending at docket entries 82 and 91.

The parties are directed to submit a joint letter, on or before **April 19, 2024**, addressing next steps in this matter, and in particular, the parties' proposals for resolving the remaining claims and counterclaims in this case.

SO ORDERED.

Dated:     March 26, 2024
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge